See also D.C., 422 F.Supp. 65.

In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

Petition of NATIONAL RAIL PASSENGER CORPORATION TO ENFORCE ARBITRATION AWARD.

No. 70–347.

United States District Court, E. D. Pennsylvania.

Oct. 1, 1976.

Carl Helmetag, Jr., Philadelphia, Pa., and Andrew P. Corcoran, Jr., Wayne, Pa., for the trustees, Penn Central Transportation Co.

Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad Co.

Andrew J. Valentine, Washington, D. C., for National Railroad Passenger Corp.

Karl J. Stipher, Indianapolis, Ind., for Amtrak.

Pepper, Hamilton & Scheetz by Laurence Z. Shiekman, Philadelphia, Pa., for ConRail.

## MEMORANDUM AND ORDER NO. 2569

FULLAM, District Judge.

National Rail Passenger Corporation ("Amtrak") has petitioned this Court for an order directing the Trustees of the Debtor's estate to carry out the terms of an arbitrators' award (National Arbitration Panel Case No. 11—In re: Level of Utility) which was confirmed by a judgment entered in the United States District Court for the Southern District of Indiana on March 24, 1976 (Civil Actions Nos. IP 76–76–C and 74–42–C). The award determined that the Trustees had failed to maintain certain passenger trackage, principally located in Indiana, in such condition as to provide for the same level of passenger service which was in effect as of May 1, 1971, as required by ¶ 4.2 of the "basic agreement" between Amtrak and the Trustees, which became effective as of May 1, 1971, in accordance with Order No. 238 in these proceedings. In essence, Amtrak seeks to have the Trustees perform the required engineering work for a program of upgrading the trackage in question, and either to perform or arrange with others to perform the necessary work, all at the expense of the Debtor's estate. (In the course of the arbitration proceeding, estimates of the costs involved ranged from $11.5 million to $22 million.)

Although Amtrak has petitioned this Court to enforce the arbitrators' award, as confirmed by the Indiana court, it is apparently the contention of Amtrak's counsel that the only issues which this Court has the jurisdiction to decide relate to choices as to which of the Debtor's assets should be devoted to the contemplated track improve-

ment. Amtrak seems to be contending that all other issues either have already been decided elsewhere, or cannot be decided because they should have been decided elsewhere. In order to attempt to understand these contentions, it is necessary to review briefly the checkered procedural history of this case.

The basic agreement between Amtrak and the Trustees requires the Trustees to maintain facilities at the same service levels prevailing as of May 1, 1971. It also provides for compensation to the Trustees by Amtrak in amounts related, initially, to costs incurred solely for passenger service. The contract also provides for arbitration of disputes. However, in authorizing the Trustees to enter into the agreement, this Court's Order No. 238 imposed the condition that final determinations of arbitrators would be subject to review and approval by this Court before becoming finally binding upon the Trustees and the Debtor's estate. In compliance with that condition, several such awards have been submitted to this Court for approval or rejection.

The arbitration proceeding pertaining to the level of maintenance of the Indiana trackage was instituted by Amtrak, in 1972, but the hearings were postponed for a lengthy period at Amtrak's request.[1] After hearing, the arbitrators (by a 2 to 1 vote) reached their decision on February 3, 1976. Amtrak later petitioned the United States District Court for the Southern District of Indiana to confirm the award. The Trustees then petitioned this Court to enjoin Amtrak from proceeding with the Indiana litigation, invoking the condition set forth in Order No. 238 and the general powers of the Bankruptcy Court. At the hearing in this Court, counsel for Amtrak acknowledged that the award could not be enforced against the Trustees or the debtor's estate except as this Court might direct; made

clear that it would be his contention that Amtrak was not bound by the condition set forth in Order No. 238; but contended that this was academic, since the Indiana Court was being asked to do nothing more than confirm the award of the arbitrators. It was conceded that, quite apart from the question of Order No. 238 and the condition it imposed, Amtrak would have to return to this Court in order to obtain enforcement of the arbitrators' decision.[2]

On that basis, I dismissed the Trustees' Petition and permitted the Indiana confirmation proceeding to go forward. Thereafter, the Trustees appeared in the Indiana court and stipulated that they had no objection to the entry of a judgment confirming the arbitrators' award, so long as the judgment was strictly limited to the actual award of the arbitrators. The Trustees submitted a proposed form of the judgment which they would be satisfied to have entered, and that was the order which was entered.

Amtrak then filed the present petition. The Trustees filed an answer, reiterating the position which they had taken, and which had been fully discussed, at the earlier hearings in this Court, namely, that as of April 1, 1976, substantially all of the Debtor's rail properties had been conveyed to ConRail, ConRail had taken over all rail operations, and substantially all of the Debtor's personnel were now employed by ConRail. In essence, the Trustees pointed out that implementation of the Rail Act relieved them of all further operating responsibilities, including any vestigial responsibilities emanating from the basic agreement with Amtrak, and that compliance with the arbitrators' award is now a legal and practical impossibility.

Amtrak thereupon sought, and obtained, a postponement of the hearing on its peti-

1. At a recent conference in chambers in this matter, Amtrak's counsel stated that it was his understanding that the delay was occasioned in part by uncertainty as to the desirability of pressing the issue, and in part by the need for time to gather evidence.

2. In retrospect, this statement of Amtrak's position may represent only one of several alternative positions. Counsel's argument was prolix and not notably lucid. But it is the only contention which this Court found acceptable as a basis for non-interference in the confirmation litigation.

tion (asserting that the scheduled date would be personally inconvenient to its counsel), and returned to the Indiana court to file a "Petition for Declaratory Judgment" seeking, *inter alia*, a determination by the Indiana court that its earlier judgment confirming the arbitrators' award was *res judicata* as to, and barred all further assertion of, issues relating to the possible impact of the Rail Act upon enforcement of the arbitrators' award. Concurrently, Amtrak sought a stay of all proceedings in this Court on its own petition for enforcement, and when this proved unsuccessful, sought further stays from the Court of Appeals and even from the United States Supreme Court. Application to the Supreme Court was filed on the eve of the scheduled hearing; a temporary stay was granted pending receipt of the Trustees' response to the application. The stay was dissolved a few days later, and the hearing in this Court was rescheduled.

In the Indiana declaratory judgment proceeding, Amtrak's counsel drafted and submitted to that Court a statement of findings and conclusions, and a form of order, all of which were signed by the court on June 25, 1976. In essence, as I understand it, this Order declares that the Trustees are barred, by the earlier judgment confirming the arbitrators' award, from asserting in this Court or elsewhere any issues relating to the impact of the Rail Act upon enforcement of the award, and all issues relating to alleged impossibility of performance. An appeal has been taken from this Order, which is now pending in the Seventh Circuit.

## II.

The first issue to be addressed is whether, as Amtrak contends, this Court lacks jurisdiction to consider whether the interposition of the Rail Act relieves the Trustees of further responsibility with respect to the upgrading of trackage now owned by ConRail. Amtrak's argument involves two somewhat related assertions: (1) that the reservation in Order No. 238 does not confer jurisdiction to review the arbitrator's

award, because that reservation was invalid, and in any event is not binding upon Amtrak in any way; and (2) the doctrine of *res judicata* precludes consideration of the stated issue by this Court, in view of the judgment or judgments entered in Indiana.

### A. *Validity and Effect of Order No. 238.*

█ The provision in the basic agreement relating to arbitration of disputes such as that involved in Case No. 11 is purely contractual; it was not mandated by the Rail Passenger Service Act of 1970. The Trustees' Petition to this Court seeking authorization to enter into the basic agreement with Amtrak was not unopposed, and many legitimate and substantial objections to the proposed contract were asserted by various parties. The statute provided for resolution by the Interstate Commerce Commission of certain disputes relating to the basis of compensation to the Trustees for operating the passenger service. Obviously, parties dissatisfied with the ICC decisions in this area would be able to obtain judicial review of those determinations. It was felt that many of the other issues which, under the contract, would be submitted to arbitration before the National Arbitration Panel, might prove to have equally substantial impact upon the Debtor's estate, yet, under the contract as originally proposed, would escape meaningful judicial review in any forum. As discussed in the Opinion filed in connection with the entry of Order No. 238, serious questions were raised as to the possibly unconstitutional impact of the basic agreement. At the very least, therefore, it seemed desirable to insure that the arbitration provisions were not so utterly open-ended as to give rise to an argument that unconstitutional impact could not be prevented.

Moreover, there was at least a serious question as to the legal propriety in a railroad reorganization context of authorizing a contract with binding arbitration provisions of the type contemplated. Section 26 of the Bankruptcy Act did provide for arbitration; however, § 26(c) provided:

"c. The written finding of the arbitrators or of a majority of them as to the issues presented may be filed in court and shall have like force and effect as the verdict of a jury."

Thus, even if § 26 of the Bankruptcy Act were held applicable to railroad reorganization proceedings, it would seem that the proposed arbitration clause in the basic agreement would be partially in conflict with § 26(c), unless the bankruptcy court reserved the right to insure that arbitrators' awards were not given any greater effect than that contemplated by § 26(c).

Moreover, § 26 of the Bankruptcy Act was the only provision of the bankruptcy laws which authorized arbitration of disputes, and it was, and is, far from clear that § 26 is applicable in railroad reorganization cases. Section 77(*l*) makes the nonrailroad reorganization provisions of the Bankruptcy Act, including § 26, applicable to proceedings under § 77 only to the extent that they are "consistent with the provisions" of § 77 itself. And § 77(c)(2) vests in the reorganization court sweeping authority over, and responsibility for, the affairs of the debtor. An argument can be made that submitting disputes to arbitration in accordance with § 26 of the Bankruptcy Act would not be "consistent with" the allocation of authority contemplated by § 77(c)(2), and that therefore § 26 does not apply in railroad reorganization proceedings. Be that as it may, at the very least it seems clear that a reorganization court can best carry out its responsibilities under § 77(c)(2) by retaining some degree of control over the implementation of the end product of arbitration, especially where the magnitude and legal ramifications of an arbitration award cannot be perceived in advance.

For all of these reasons, I am satisfied that the condition included in Order No. 238 is entirely valid. But even if it were otherwise, the fact remains that the Trustees were authorized to enter into the Amtrak agreement only upon that condition. Amtrak, like any other party contracting with court-appointed trustees, can validly contract with them only to the extent authorized by the appointing court. I thus am unable to accept the suggestion that, somehow, Amtrak is free to ignore the provisions of Order No. 238.

In my view, Amtrak would be bound by the provisions of Order No. 238 even if it had been unaware of the condition imposed by the Court, until after the contract was executed. But no one can seriously suggest that Amtrak was not fully conversant with the terms of Order No. 238. The initial hearing on the Trustees' Petition for approval of the Amtrak contract commenced on April 20, 1971. In the course of that hearing, it was agreed that the cross-examination of certain witnesses would be deferred until a final hearing to be held three days later, on April 23, 1971. While Amtrak did not formally enter an appearance or participate as a party in these hearings, counsel for Amtrak, R. Chapman Rose, Esq., attended at least the April 20 hearing, and participated therein to the extent of making a brief argument in support of the Trustees' Petition (Tr. pp. 1692–97). In the course of these hearings, particularly at the April 23 hearing, the arbitration provisions of the proposed contract came under heavy attack; indeed, many parties insisted that the type of condition ultimately inserted in Order No. 238 would provide insufficient protection. At the conclusion of the April 23 hearing, the Court sought information as to whether Amtrak had any objection to the proposed reservation relating to arbitration, and counsel for the Trustees advised that Amtrak had expressed no objection. The record does not disclose whether any representative of Amtrak was actually in attendance at the hearing on April 23. However, either that same day, or within two or three days thereafter, at the request of Amtrak's counsel, a conference in chambers was held, attended by Mr. Rose and other representatives of Amtrak, together with counsel for the Trustees. At that conference, Amtrak sought, unsuccessfully, to have the condition about arbitration removed from Order No. 238; and it was made clear that Amtrak would seriously

consider the possibility of challenging that feature of the Order by means of an appeal therefrom. However, Order No. 238 was not appealed, by anyone.

## B. *Review Irrespective of Order No. 238.*

■ Wholly apart from the provisions of Order No. 238, I find unacceptable the notion that a reorganization court is without jurisdiction to consider the propriety and feasibility of a proposal that the Trustees of the Debtor must forthwith embark upon a program of trackage rehabilitation involving potential expenditures (as to one small segment of the Debtor's property) of $11.5 million to $22 million. Irrespective of the provisions of Order No. 238, and even if the Rail Act had never been enacted, and the Trustees were still operating the railroad, the effect to be given in these reorganization proceedings to the conclusions of the arbitrators would have been a matter for determination by this Court. Section 77(c)(2) of the Bankruptcy Act provides that even the orders of governmental regulatory agencies requiring that certain work be done in order to protect the safety of the traveling public, are binding upon the Debtor's estate only if approved by the Court (or, under certain limited circumstances, the ICC); surely mere contractual obligations are entitled to no greater weight.

## C. *The Indiana Judgment.*

■ The arbitrators in Case No. 11 determined that the trackage in question was not being maintained so as to provide a level of utility commensurate with that existing as of May 1, 1971, and that under Paragraph 4.2 of the basic agreement, it was the responsibility of the Trustees to arrange for the upgrading, at no cost to Amtrak. In the course of the hearings before the arbitration panel, Amtrak expressly disclaimed any intention to seek damages for the alleged inadequate maintenance (an understandable concession, since

(a) the possibility that Amtrak could prove that it had suffered damages was remote, and (b) under the operating agreement, if the Trustees had spent more on maintenance, the compensation due them from Amtrak would have been increased, at least to some extent). Amtrak sought only prospective relief, and the arbitrators' award was prospective only.

Moreover, the arbitrators' report expressly refused to resolve any issues concerning the effect of the Rail Act and the forthcoming conveyance to ConRail, stating

"Accordingly, the Panel does not consider that it is the proper body to decide whether, or to what extent, the Regional Rail Reorganization Act of 1973 or the Final System Plan thereunder may affect ˙the carrying out of this award." [3]

The judgment of the United States District Court for the Southern District of Indiana which was entered on March 24, 1976, confirming the award, was strictly limited to the provisions of the award itself. The judgment added nothing to the award, except finality. Essentially the only issues which could have been resolved in the confirmation proceeding were such matters as the integrity of the arbitrators, the absence of fraud or collusion, and the jurisdiction of the arbitrators, under the terms of the contract, to render the award.

■ The judgment confirming the award is a final judgment, and is entitled to be given *res judicata* effect in these proceedings. No one has ever contended otherwise. In short, it is now finally settled that the Trustees had not fully complied with their obligation to maintain the trackage involved, and that Amtrak was entitled to have the situation speedily remedied. But the impact of the Rail Act upon effectuation of the award was clearly left open for later determination elsewhere.

It is only this judgment, entered on March 24, 1976, which has become final. If

---

**3.** The dissenting member was of the view that the award should not be entered at all, because the Rail Act made compliance impossible.

for no other reason than lack of finality, therefore, nothing which thereafter occurred in the Indiana court could give rise to the bar of *res judicata* or estoppel. *See, e. g., Kreager v. General Electric Co.*, 497 F.2d 468, 472 (2d Cir. 1974), *cert. denied*, 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974). In the interests of completeness, however, it is appropriate to discuss briefly the "declaratory judgment" proceedings later held in that court.

■ A court which renders a judgment is ordinarily powerless to decide what effect is to be accorded that judgment in litigation before other courts. The Trustees have argued, and apparently are contending on appeal, that the "declaratory judgment" rendered by the Indiana court on June 5, 1976, was merely an advisory opinion, and therefore beyond the jurisdiction of that court, in the absence of an actual case or controversy. Since these issues are to be decided by the appropriate appellate court, I express no view as to the jurisdiction of the Indiana court in this regard. The views of the District Court in Indiana as to the effect which should be given to its earlier judgment, while not binding upon this Court, are nevertheless entitled to careful consideration.

But having carefully considered the views of the Indiana court, and notwithstanding my great respect for that tribunal, I find myself unable to agree with its conclusions.

In the first place, I cannot understand how an arbitrators' award which expressly left certain issues open for later determination by other tribunals can, by a confirmation judgment expressly limited to the terms of the award, be deemed to have resolved those very issues. In the second place, I do not believe that issues of such magnitude and potential importance to the future of rail passenger service throughout a large segment of the nation should be deemed to have been resolved by a process of procedural sleight-of-hand, rather than on their merits. And finally, as will be discussed below, compliance with the arbitrators' award, as confirmed, is a legal and practical impossibility, and would plainly conflict with Congressional mandates.

I have therefore concluded that, in ruling upon Amtrak's petition in this proceeding, this Court must consider the effect of the Rail Act.

### III.

■ The basic agreement between Amtrak and the Trustees required the Trustees to maintain the trackage at its May 1, 1971 level of utility for a period of 25 years. But on April 1, 1976, as mandated by the Rail Act and the Final System Plan promulgated thereunder, the Trustees' ownership of the railroad and responsibilities for operating it became vested in ConRail. The suggestion that the Trustees nevertheless remain liable to maintain the property for all, or any part of, the remaining 20 years of the term of the agreement deserves serious consideration only if one assumes that Amtrak, unlike all of the thousands of other parties having legal relationships with the Penn Central, has been granted some kind of immunity from the impact of Congressional action. Needless to state, no such immunity has been conferred.

■ Congress plainly intended to eliminate the involvement of bankrupt estates and reorganization courts in the ownership and operation of the rail system in the northeastern part of the United States. By providing, in the Final System Plan approved by Congress, for the conveyance of ownership and operating responsibilities to ConRail as of April 1, 1976, Congress achieved that goal. The Final System Plan itself expressly deals with the question of ongoing maintenance and improvement of trackage to the level required by Amtrak (see Final System Plan Vol. 1, pp. 30, 43–44). To require the Trustees to plan for, finance, and carry out maintenance and improvements after the April 1 cutoff date would be clearly inconsistent with these provisions, as well as with the provisions of § 211(h) of the Rail Act (governing the transitional financial arrangements between ConRail and the Trustees) and the

valuation process now under way in the Special Court.[4]

The contract between the Trustees and Amtrak makes it abundantly clear that the question of maintenance and improvement is inseparable from continued ownership. The Trustees were required to maintain their own railroad, not someone else's. They were required to use their own employees (because of the terms of existing collective bargaining agreements), not someone else's. The contract purports to be binding upon the successors and assigns of the Trustees, without regard to whether such successor or assignee did or did not assume the obligations of the contract. Whether this means that Amtrak is entitled to enforce these obligations as against Con-Rail is not for this Court to decide. Depending upon how that question is ultimately resolved, it may be that Amtrak might be able to establish that implementation of the Rail Act has deprived it of valuable rights, for which it is entitled to a remedy; or ConRail might be able to establish that its assumption of these liabilities comes within the "other benefits" aspect of the valuation proceedings in the Special Court. I express no view as to any of these matters.

For the reasons thus far discussed, the relief sought by Amtrak in the present case cannot and will not be granted.[5]

## IV.

The procedures sought to be followed by Amtrak in connection with this entire matter have been such that, in aid of this Court's jurisdiction and to prevent undue interference with the reorganization process, an Order was earlier entered enjoining Amtrak from initiating or pursuing litigation on this subject in other jurisdictions, pending hearing and determination of the present petition. At a recent conference in chambers, it was apparent that, in the absence of that restriction, Amtrak intended to return to the Indiana court, or perhaps other courts, in an attempt to obtain a further expansion of the confirmed arbitrators' award, or perhaps in some other fashion to obtain "reparations." I do not profess to understand fully the legal theory or alleged basis for any such attempts, but I am persuaded that the injunction should remain in effect. If this Court's view of the matter is incorrect, it can be corrected on appeal; if correct, the injunction is proper.

AND NOW, this 30th day of September, 1976, upon consideration of the "Petition of National Rail Passenger Corporation for Order Authorizing, Instructing and Directing the Trustees to Carry out the Judgment of the U. S. District Court, Southern District of Indiana to Restore or Cause to be Restored Certain Rail Lines in Indiana" (Document No. 10440), and after hearing thereon, it is ORDERED:

1. The Petition is DENIED.

2. The Petitioner, National Rail Passenger Corporation ("Amtrak"), is enjoined from instituting or furthering any legal proceeding for the assertion or enforcement against the Trustees or the estate of the Debtor of any alleged obligation or liability

---

4. For example, the Special Court is required to give consideration to "erosion" of the Debtor's estate stemming from pre-conveyance operations. If Amtrak's present contention were sound, such erosion would continue to pile up for the next 20 years. Moreover, the valuation of the properties themselves would be thrown into confusion.

5. The entire question of upgrading trackage for passenger service (which requires, for comfortable, high-speed operation, better track conditions than is necessary for freight service) has received and is receiving the attention of Congress, the Department of Transportation, and the appropriate regulatory agencies. The ICC has recently completed a rule-making proceeding, Ex Parte No. 277 (Sub. No. 2), *Adequacy of Intercity Rail Passenger Service-Track*, the report of which contains a thorough canvass of the field. 348 ICC Rpts. 518–80. Contrary to the implications of some of Amtrak's arguments in this case, the views expressed herein are entirely consistent with the views expressed by the Commission, which, at page 539, n. 4 states: "As of April 1, 1976, Penn Central ceased operations. It has been succeeded by Consolidated Rail Corporation (ConRail) in its former operations discussed herein."

for track maintenance or improvement, in any jurisdiction or before any tribunal except this Court (or, if appropriate, in the Special Court), or as otherwise ordered by this Court. Nothing in this Order shall be deemed to apply to the appeal now pending in the Circuit Court of Appeals of the Seventh Circuit, nor to any appeal from this or any other Order of this Court.