**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff-Appellee,**

v.

**Robert W. BLANCHETTE et al., Defendants-Appellants.**

**No. 76–1829.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1976.

Decided Feb. 15, 1977.

Carl Helmetag, Jr., Philadelphia, Pa., for defendants-appellants.

Andrew J. Valentine, Washington, D. C., Karl J. Stipher, Charles T. Richardson, Indianapolis, Ind., for plaintiff-appellee.

Before HASTINGS and MOORE,* Senior Circuit Judges, and SPRECHER, Circuit Judge.

HASTINGS, Senior Circuit Judge.**

We are concerned here with various issues arising out of an order by the district court,[1] entered on March 24, 1976, confirming an arbitration award compelling the restoration of certain tracks by Penn Central Transportation Company (Penn Central); and also with the judgment entry and memorandum order by the district court entered on June 25, 1976, granting the motion of the National Railroad Passenger Corporation (Amtrak) for summary judgment in a declaratory judgment action,

thereby enforcing the district court's previous order of confirmation. Penn Central has appealed.

## I

For purposes of clarity we first mention three relevant substantive legislative enactments of the Congress:

1. The Bankruptcy Act of 1898, which was amended in 1933 by adding Section 77 thereto, which provided for the reorganization of railroads. Section 77 furnished the structural framework by which Penn Central commenced its reorganization proceedings before the United States District Court for the Eastern District of Pennsylvania (Reorganization Court). Bankruptcy Act of 1898, as amended, 11 U.S.C. § 205; Reorganization of Railroads.

2. The Rail Passenger Service Act of 1970, 45 U.S.C. § 501, *et seq.*, which created the National Railroad Passenger Corporation, a for-profit corporation, pursuant to the District of Columbia Business Corporation Act, to provide intercity rail passenger service over a designated basic national rail passenger system, as a private enterprise, but with federal financial assistance. The need for such a corporation arose from the specific Congressional finding that a modern, efficient, intercity railroad passenger service was a necessary part of a balanced transportation system and was in the national interest. The National Railroad Passenger Corporation (Amtrak) was authorized to contract with each railroad operating passenger trains in a basic system, for use by Amtrak of railroad tracks, facilities and services "on such terms and conditions as the parties may agree." *See* 45 U.S.C. § 562(a). Subsequent amendments to 45 U.S.C. § 501, *et seq.,* have merely supplemented the basic legislation. See Amtrak Improvement Act of 1974 (Public Law 93–496, October 28, 1974, 88 Stat. 1527). The

* The Honorable Leonard P. Moore, Senior United States Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

** This opinion was written and approved by the panel and sent to Midwest Law Printing Co., Inc., for printing prior to Judge Hastings' death on February 7, 1977.

1. United States District Court for the Southern District of Indiana, Indianapolis Division, the Honorable William E. Steckler, Chief Judge, presiding.

Amtrak Improvement Act of 1974, *supra,* amended the name of the Railroad Passenger Service Act of 1970 to become the Rail Passenger Service Act. See Section 12 of the 1974 amendment. The Act is referred to by the parties and will herein be referred to simply as the "Amtrak Act."

3. The Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701, *et seq.* (Public Law 93–236, January 2, 1974, 87 Stat. 986), referred to by the parties and by our court as the "Rail Act," provided for the establishment of the United States Railway Association and the Consolidated Rail Corporation (ConRail), both with enumerated powers and duties. The United States Railway Association was created as a Government corporation, incorporated under the District of Columbia Nonprofit Corporation Act, and was empowered to prepare and implement a Final System Plan. ConRail was created as a for-profit corporation, incorporated under the laws of a state, with its principal office in Philadelphia, Pennsylvania. Pursuant to Section 742, ConRail was to acquire, operate, rehabilitate and maintain efficient rail service over the rail lines designated in the Final System Plan.

Amtrak brought the instant declaratory judgment action on May 5, 1976, pursuant to 28 U.S.C. §§ 2201 and 2202, alleging both diversity of citizenship and federal question jurisdiction. The relief sought was an order to show cause upon Penn Central why a quarterly work schedule for the restoration of 360 miles of Penn Central tracks had not been submitted to Amtrak on May 3, 1976, as required by the order of confirmation and the arbitration award referred to earlier. This declaratory action was brought in the United States District Court for the Southern District of Indiana, Indianapolis Division.

Amtrak initiated arbitration proceedings on August 18, 1972, in the Reorganization Court, pursuant to a broad arbitration clause entered into by the parties in The National Railroad Passenger Corporation Agreement of April 16, 1971. This agreement is referred to by the parties as the "Basic Agreement," and was mandated by Section 561(a) of the Amtrak Act, 45 U.S.C. § 501, *et seq.,* whereby Amtrak was directed to contract with the railroad "to relieve the railroad of its entire responsibility for the provision of intercity rail passenger service" under "such terms and conditions as necessary to permit the Corporation [Amtrak] to undertake passenger service on a timely basis."

Under the terms of the Basic Agreement, Amtrak undertook to assume the intercity rail passenger responsibilities of the Trustees of Penn Central and all other contracting railroads, and Penn Central undertook to render certain services to Amtrak and to maintain its rail lines used by Amtrak at an agreed upon "level of utility."

Under Article Six of the Basic Agreement any "claim or controversy" between Amtrak and Penn Central was to be resolved by binding arbitration in accordance with the provisions of The National Railroad Passenger Corporation Arbitration Agreement separately contracted to by the parties on April 16, 1971. Referred to by the parties as the "Arbitration Agreement," Section 4.2 provides:

"* * * [A]ny arbitration award hereunder made by a *majority* of the members of any Arbitration Panel shall be binding upon the parties thereto. Any arbitration award hereunder shall declare the rights of the parties thereto and *may make awards of money, or enjoin or otherwise operate in such a way as to require specific performance by a party of any act or obligation.*" (Emphasis added.)

Section 4.3 of the Arbitration Agreement further provides:

"Judgment may be entered upon any arbitration award hereunder * * * in any United States District Court."

A dispute arose between Amtrak and Penn Central concerning the "level of utility" of about 360 miles of certain rail lines of Penn Central connecting Kankakee, Illinois, with Louisville, Kentucky, and Cincinnati, Ohio, via Indianapolis, Indiana, under the Basic Agreement of 1971. Amtrak's claim that Penn Central had defaulted in its

obligation to maintain the track was duly submitted to the National Arbitration Panel.[2]

After the parties submitted extensive written memoranda and oral testimony was heard, the arbitration was interrupted by an "Emergency Order" of the Federal Railroad Administration on August 1, 1974. This emergency order terminated Amtrak's service on the above-mentioned Penn Central line because the track had been found to be "in an unsafe condition," creating "an emergency situation involving a hazard of death or injury to persons affected by the use thereof."

Without objection from Penn Central and in accordance with its rules, the Panel began additional hearings, accepted a revised request for an award from Amtrak, and received additional evidence on September 11, September 24, September 29 and December 16, 1975, and January 20, 1976. Thereafter, on February 3, 1976, the National Arbitration Panel issued a written award in NAP Case No. 11, *In Re: Level of Utility,* with the following declarations and awards:

First, the Panel declared that Amtrak had a contract right to have the Penn Central rail lines connecting Kankakee with Cincinnati and with Louisville via Indianapolis kept "at no less than the level of utility" which existed on May 1, 1971.

Second, the Trustees of Penn Central had defaulted in keeping this bargain.

Third, the Trustees were ordered to "cause" the restoration of these lines to their proper condition by January 1, 1978, in accordance with a "Panel Program," which provided, *inter alia,* for a detailed work schedule to be submitted to Amtrak within ninety days of this award.

The estimates of the cost of these repairs ranged from 22 million dollars, based upon independent evaluation, to 11 million dollars, estimated by Penn Central using its own employees. Costs were estimated in terms of October 1975. The Panel's award further provided that Penn Central would bear the entire financial burden of the repairs.

A dissenting opinion was handed down by Panel Member Johnson, recommending the denial of Amtrak's claim for specific performance. He noted that in 1971 the rail lines were already in a state of deterioration and that the present award would upgrade the lines beyond the May 1, 1971, level at the total expense of Penn Central. Although conceding that Penn Central had in fact defaulted by permitting the lines to deteriorate generally since 1971, Arbitrator Johnson stated that, upon the record, the issue of what constituted maintenance on the one hand and rehabilitation on the other, had not been answered. Johnson, therefore, concluded that the inequity of ordering Penn Central to pay the entire cost of the "Panel Program" was an arbitrary interpretation of Section 4.2, *supra,* and suggested that the expense of the program be shared equally.

On February 4, 1976, pursuant to 9 U.S.C. § 9, United States Arbitration Act, and Section 4.3 of the Arbitration Agreement, *supra,* Amtrak petitioned the United States District Court for the Southern District of Indiana, Indianapolis Division, for confirmation of the arbitration award. However, on February 17, 1976, Penn Central petitioned the Reorganization Court in the Eastern District of Pennsylvania for an order requiring Amtrak to show cause "why it should not be required * * * to comply with the provisions of Order No. 238 and, pending the filing of said petition, why it should not be enjoined from proceeding further in the [Confirmation Proceeding]."

In authorizing the Trustees of Penn Central to enter into the Basic Agreement with Amtrak, the Reorganization Court in Order No. 238, in pertinent parts, stated:

**2.** The National Arbitration Panel is a special arbitration panel created in Article One of the Arbitration Agreement of April 16, 1971. The panel is composed of three arbitrators representing both railroad and Amtrak interests, and convenes in Washington, D. C. The jurisdiction of the panel is limited to "claims or controversies" that may arise under the Basic Agreement.

"1. The Trustees are authorized to execute a contract with Amtrak in substantially the form submitted to the Court at the hearing, PROVIDED, however, * * (b) that whenever any matter is resolved by arbitration pursuant to the Main Agreement or the Arbitration Agreement, the decision shall be submitted to this court for review and approval before becoming finally binding upon the Trustees or the Debtor, during the pendency of these reorganization proceedings.

\* \* \* \* \* \*

"4. The Court reserves jurisdiction over said contract for the purpose of directing such actions and granting such further relief as may be necessary to protect the interests of the Debtor's Estate."

The Reorganization Court, however, never ruled on Penn Central's February 17, 1976, petition to show cause, because the Trustees of Penn Central subsequently consented to the entry of a judgment in the Indiana Court. The consent of the Trustees, and by implication that of the Reorganization Court, was induced by the assurances of counsel for Amtrak that it was only attempting to liquidate its claim in the Indiana court, and that Amtrak was well aware of and, in fact, accepted the primary jurisdiction of the Reorganization Court.

Language from Amtrak's memorandum, as it appears in the record in the Reorganization Court, reads:

"any judgment entered by the Indianapolis District Court upon Amtrak's Petition to Confirm will not serve to make the award of the National Arbitration Panel finally binding upon the Trustees. To become finally binding, execution on the judgment would be necessary. Yet execution in any court other than this Reorganization Court would so manifestly interfere with the Court's exclusive juris-

diction to control the administration of the estate that it would be impossible to support in law or fact. Therefore, in order for Amtrak to make the award *finally binding* upon the Trustees, the entire matter will eventually have to be submitted in the bankruptcy proceedings * * * The mere fact that the arbitration claim has been reduced to a judgment will not prevent this Court from making an inquiry since the merger of a claim into a judgment does not change its nature as far as provability is concerned."

Thereafter, the Trustees consented to the entry of judgment in the Confirmation Proceedings in Indiana, based upon the above assertions in the Reorganization Court, that the Indiana Court would review the arbitration proceedings "to see that the award was a proper award and that the arbitrators acted honestly and did not exceed their powers." Thereafter, the Indiana Court entered an Order of Confirmation on March 24, 1976.

On April 9, 1976, Amtrak petitioned the Reorganization Court for enforcement of the now confirmed Arbitration Award. Penn Central, thereafter, filed an answer to the petition for enforcement, asserting that the award could not be enforced against Penn Central because the rail tracks in question had been conveyed to ConRail pursuant to the Rail Act, and therefore, Penn Central's obligation to restore the tracks was terminated. Amtrak secured an indefinite postponement of its petition in the Reorganization Court, returned to the Indiana Court and filed its instant declaratory judgment action in Indiana.

■ During the arbitration proceedings between the litigants, Congress supplemented Section 77 of the Bankruptcy Act with the Rail Act, as herein earlier set out.[3] The Rail Act, like the Amtrak Act, was designed to revitalize the nation's rail sys-

---

**3.** As the Supreme Court recognized in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 153, 95 S.Ct. 335, 363, 42 L.Ed.2d 320 (1974):

"Congress, in enacting those provisions, clearly intended to legislate pursuant to the

bankruptcy power. The Rail Act, like § 77 of the Bankruptcy Act, which the Rail Act supplements, merely 'advances another step in the direction of liberalizing the law on the subject of bankruptcies,' . . . .'" (Citations omitted.)

tem, and the rail lines in issue here were designated for transfer to ConRail. Penn Central contends that such a transfer to ConRail relieved it of the responsibility to restore the 360 miles of track, and that, in any event, the issue was one in the exclusive jurisdiction of the Reorganization Court pursuant to its Order 238, *supra*.

At the center of this controversy is the Indiana Court's conclusion of law that:

"5. The judgment upon the arbitration award of the National Arbitration Panel entered by this Court on March 24, 1976, is *res judicata* concerning and is a conclusive bar against any further legal claims which may be made by the Trustees that:

(a) the award of the National Arbitration Panel and judgment of this Court entered thereon is invalid and nonenforceable because of the provisions of the Regional Rail Reorganization Act of 1973; or

(b) the rehabilitation of the rail lines which are the subject of this controversy at the sole cost of the Trustee is unreasonable or inequitable in view of the April 1, 1976, transfer of these lines to ConRail; or

(c) the judgment should not be carried out because of any facts, circumstances or legal defenses which could have been or ought to have been asserted during the confirmation proceedings as a ground for vacating the award under the provisions of Section 10 of the Federal Arbitration Act or for modifying or correcting this award under Section 11 of the Federal Arbitration Act, 9 U.S.C. §§ 10 and 11."

It is quite clear to us that the Indiana Court intended to and did set up its judgment upon the arbitration award as a final and conclusive judgment, holding that it was *res judicata* concerning the arbitration award and a complete bar to further consideration of the claims set out in subparagraphs (a), (b) and (c) above.

At this point it appears relevant to report a late happening. On September 30, 1976, Judge Fullam of the Reorganization Court entered Order No. 2569 which *denied* Amtrak's petition for an order authorizing, instructing and directing the Trustees of Penn Central to carry out the judgment of the Indiana District Court to restore or cause to be restored certain rail lines in Indiana. Judge Fullam further enjoined Amtrak, pursuant to Order 238, *supra*, as follows:

"The Petitioner, National Rail Passenger Corporation ('Amtrak'), is enjoined from instituting or furthering any legal proceeding for the assertion or enforcement against the Trustees or the estate of the Debtor of any alleged obligation or liability for track maintenance or improvement, in any jurisdiction or before any tribunal except this Court, (or, if appropriate, in the Special Court), or as otherwise ordered by this Court. *Nothing in this order shall be deemed to apply to the appeal now pending in the Circuit Court of Appeals of the Seventh Circuit, nor to any appeal from this or any other Order of this Court.*" (Emphasis added).[4]

On October 1, 1976, Judge Fullam handed down a Memorandum and Order with respect to his Order No. 2569. This appears in Appendix F of Amtrak's brief filed here in the instant appeal. Judge Fullam, *inter alia*, gave an analysis of the procedural history of this proceeding with respect to the Indiana Court. He fully considered the effect of the Rail Act as it related to ConRail. He paid his respects to Amtrak's intentions, absent the injunctive restrictions hereinabove set out, to return to the Indiana Court, or perhaps other courts in an attempt to obtain a further expansion of the confirmed arbitrator's award, or perhaps in some other fashion to obtain "reparations." Judge Fullam, stating that he was unable to fully understand the legal theory or basis for Amtrak's attempts, held that the injunction should remain in effect.

---

4. Amtrak has in fact appealed from Judge Fullam's Order No. 2569, as we were advised by counsel during oral argument. This appeal is now pending before the Court of Appeals for the Third Circuit.

## II

We first consider whether the Indiana Court had jurisdiction by declaratory judgment or any other judicial means to circumscribe the jurisdiction of the Pennsylvania Reorganization Court, as to the enforcement of an arbitration award which was subsequently confirmed by the Indiana Court.

■ At the outset it seems quite clear to us that in a railroad reorganization, the power to resolve all disputes involving the estate and to determine the enforceability and status of all claims is vested exclusively in the Reorganization Court. See the injunctive powers in Section 77(j) of the Bankruptcy Act, 11 U.S.C. § 205(j). *Baker v. Gold Seal Liquors*, 417 U.S. 467, 477, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974), Mr. Justice Stewart concurring. *Baker* was a Penn Central reorganization case in which the Seventh Circuit was reversed. In the *New Haven Inclusion Cases*, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), a similar question was presented concerning a railroad reorganization under Section 77. Two groups of creditors sought relief in different tribunals. The two courts reached different decisions as to the proper compensation. The Supreme Court on review of the proceedings, first addressed itself to the conflict of jurisdiction and found that it rested exclusively in the Reorganization Court. *New Haven Cases*, 399 U.S. at 426, 428–429, 90 S.Ct. 2054.

We find that the plenary and exclusive jurisdiction of the Reorganization Court to determine issues that directly affect and concern the reorganization, including the enforcement of the Arbitration Award, is exemplified by *In Re New York, New Haven and Hartford Railroad Co.*, 2 Cir., 457 F.2d 683 (1972), *cert. denied, Smith v. Baker*, 409 U.S. 890, 93 S.Ct. 106, 34 L.Ed.2d 147, *reh. denied*, 409 U.S. 1019, 93 S.Ct. 430, 34 L.Ed.2d 311 (1972). The court there was presented with the "conflict of jurisdiction between two federal courts each claiming jurisdiction to affect interests in certain property over which, under a literal reading of § 77(a), one federal court has 'exclusive jurisdiction.' " 457 F.2d at 687.

The court held that the New Haven Railroad Reorganization Court was without jurisdiction to establish a lien against the Penn Central properties in favor of the New Haven. The court further held that the exclusive jurisdiction to determine how claims or rights should be enforced in the Penn Central reorganization rested solely in the Penn Central Reorganization Court. The court was careful to stress the Congressional purpose behind the enactment of Section 77 in general and the necessity to award the overlapping jurisdiction of numerous courts. To hold otherwise "would tend greatly to foment conflicts between coordinate courts * * *." 457 F.2d at 688–689. (Citations omitted.)

This is not to say that the Reorganization Court may not delegate to other forums the resolution of factual disputes while retaining jurisdiction in itself over the enforcement of factual determinations made elsewhere. In its Order No. 771, the Reorganization Court recognized that the merits of a contractual dispute are clearly severable from the reorganization proceeding itself, so long as that court retains to itself the jurisdiction to decide at a later stage, if necessary, all issues concerning the implementation of any relief which may be granted in the state court action. In the *New Haven Inclusion Cases*, 399 U.S. at 433–434, 90 S.Ct. 2054, the Supreme Court gave its imprimatur to such a practice.

This practice is further evidenced by the Reorganization Court's authorization to the Trustees to enter into the Basic Agreement with Amtrak, which contained a provision for the arbitration of disputes arising from the interpretation of the Agreement, and retaining to itself jurisdiction over the enforcement of any arbitration awards (Order No. 238).

In support of their motion for summary judgment in the Indiana Court, Amtrak relied upon *The Hartbridge*, 2 Cir., 57 F.2d 672, 673 (1932), *cert. denied, Munson S. S. Line v. North of England S. S. Co., Ltd.*, 288 U.S. 601, 53 S.Ct. 320, 77 L.Ed. 977 (1933),

to support their position that because the Trustees have had their "day in court," they could not then seek review in the Reorganization Court of matters previously litigated. *The Hartbridge*, however, only goes so far as to say that where a party to an arbitration award has not opposed a proceeding to confirm it, that party cannot later move to vacate the award. Here the Trustees did not seek to have the award vacated. The Trustees say they were satisfied that the arbitrators acted properly in confining their inquiry to the determination of the Trustees' obligations under the agreement, leaving to the Reorganization Court the enforcement of the award. The analogy drawn between the decision of the court in *Hartbridge* and the instant case is misplaced.

Of direct interest here is *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940). *Kalb* arose under the provisions of Section 75 of the Bankruptcy Act, 11 U.S.C. § 203 (the Frazier-Lemke Act). Kalb, a farmer, filed a petition for the composition and extension of time to pay his debts. Two mortgagees began foreclosure proceedings against Kalb's Wisconsin farm while the petition was pending. Kalb's land was sold by the sheriff under a judgment of foreclosure. Kalb took no steps to stay the foreclosure or the action to enforce it. On appeal from the judgment of the Supreme Court of Wisconsin in favor of the mortgagees, the jurisdiction of the Wisconsin Supreme Court to proceed as it did was presented to the Supreme Court of the United States. *Id.* at 436, 60 S.Ct. 343.

Speaking for the Court in *Kalb*, Mr. Justice Black wrote, *inter alia*, "The Constitution grants Congress exclusive power to regulate bankruptcy and under this power Congress can limit the jurisdiction which courts, state or federal, can exercise over the person and property of a debtor who duly invokes the bankruptcy law. * * * We think the language and broad policy of the Frazier-Lemke Act conclusively demonstrate that Congress intended to, and did deprive the Wisconsin County Court of the power and jurisdiction to continue or maintain in any manner the foreclosure proceedings * * * without the consent after hearing of the bankruptcy court in which the farmer's petition was then pending." *Id.* 308 U.S. at 439–440, 60 S.Ct. at 346.

■ It seems quite clear to us that the Indiana Court was without jurisdiction by declaratory judgment, or other judicial means, to circumscribe the jurisdiction of the Pennsylvania Reorganization Court as to the enforcement of an arbitration award which was subsequently confirmed by the Indiana Court, and we now so hold.

### III

Penn Central questions whether the Indiana Court had before it a "controversy" which would give it jurisdiction under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, to determine the effect of its earlier order. In short, Penn Central contends that the declaratory judgment here is an advisory opinion and a nullity under the Declaratory Judgment Act.

In view of our disposition of this appeal we shall assume that there was a "controversy" before the Indiana Court which enabled it to proceed. Whether the actions it took were proper is quite another question.

### IV

We next proceed to the question of whether the Indiana Court was correct in holding that its earlier confirmation order was *res judicata* in the proceedings which earlier had been commenced in the Reorganization Court to enforce the confirmed order.

As hereinabove indicated in Part I of this opinion, the Indiana Court expressly held that its judgment of March 24, 1976, upon the arbitration award was a final and conclusive judgment and was *res judicata* concerning and was a conclusive bar against any further legal claims which may be made by the Trustees and explicitly set out the nature of the claims so barred.

Amtrak's complaint sought a declaratory judgment from the Indiana Court as to whether issues raised in the Trustees' answer to Amtrak's petition in the enforce-

ment proceedings were barred by *res judicata*.

■ We are unable to find any precedent, and none has been cited to us, for referring back to the court of first adjudication (the Indiana Court) the question of whether its judgment is *res judicata* in another court, here, the Reorganization Court. The law is to the contrary. That is, in this case the Reorganization Court has the responsibility to decide whether the issues before it are barred by the prior adjudication in the Indiana Court. *Cf. Donovan v. City of Dallas*, 377 U.S. 408, 412, 84 S.Ct. 1579, 12 L.Ed.2d 409 (1964), citing *Kline v. Burke Construction Co.*, 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922).

■ The Trustees left no doubt as to their position and the record clearly shows that the Confirmation Proceeding had the *limited purpose* to review the arbitration proceedings "to see that the award was a proper award and that the arbitrators acted honestly and did not exceed their powers." To that limited extent only the Indiana Court acted within its powers. *See* 9 U.S.C. §§ 9, 10 and 11.

We find nothing in the Act of Congress that expresses any intent that the Reorganization Court was to be divested of its plenary powers in preference to the declaratory judgment power of the Indiana Court.

In passing, we note here that the Arbitration Panel held that it was without jurisdiction to decide the ConRail issue. The issue was not raised before the Indiana Court. Yet, Amtrak urged and the Indiana Court held that the Trustees could not raise the issue of the transfer of the subject rail lines to ConRail.

We are therefore compelled to the conclusion that the Indiana Court erred in finding that the enumerated bars against the Trustees were *res judicata* of the matters set out in its Conclusion of Law No. 5, *supra*, and we so hold.

## IN SUMMARY

In view of the foregoing, we hold that the Declaratory Judgment of the Indiana Court was an improper exercise of its limited jurisdiction and was wrong on the merits. Accordingly, the judgment of the Indiana Court is reversed. This case is remanded to the Indiana Court with directions to vacate its declaratory judgment.

The issues hereinabove discussed are within the exclusive jurisdiction of the Pennsylvania Reorganization Court and it may now proceed therewith.

REVERSED.

REMANDED WITH DIRECTIONS.

