**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**Appeal of NATIONAL RAILROAD PASSENGER CORPORATION.**

No. 76–2542.

United States Court of Appeals, Third Circuit.

Argued April 1, 1977.

Decided July 25, 1977.

As Amended Aug. 11, 1977.

170

Andrew J. Valentine, Washington, D.C., F. Hastings Griffin, Jr., Philadelphia, Pa., for appellant. Karl J. Stipher, Baker & Daniels, Indianapolis, Ind., of counsel.

Carl Helmetag, Andrew P. Corcoran, Jr., Stephen S. Dittmann, Philadelphia, Pa., for appellees, Penn Central Trustees.

Before GIBBONS, VAN DUSEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal, taken pursuant to the Bankruptcy Act, 11 U.S.C. § 47, from Order 2569, dated October 1, 1976, of the United States District Court for the Eastern District of Pennsylvania (the Reorganization Court), entered in the Penn Central Railroad reorganization proceedings. Order

2569 [1] denied a petition of the National Rail Passenger Corporation (Amtrak) for an order "authorizing, instructing, and directing" the trustees of the Penn Central to carry out a March 24, 1976, judgment of the United States District Court, Southern District of Indiana [2] which confirmed an arbitration decision [3] that the trustees should restore or cause to be restored certain rail lines in Indiana so as to provide for the same level of passenger service which was in effect as of May 1, 1971. We vacate the first sentence of paragraph 2 of Order 2569 and affirm it in all other respects.

1. Order 2569 in pertinent part provided:

 "AND NOW, this 30th day of September, 1976, upon consideration of the 'Petition of National Rail Passenger Corporation for Order Authorizing, Instructing and Directing the Trustees to Carry out the Judgment of the U.S. District Court, Southern District of Indiana to Restore or Cause to be Restored Certain Rail Lines in Indiana' (Document No. 10440), and after hearing thereon, it is ORDERED:

 "1. The Petition is DENIED.

 "2. The Petitioner, National Rail Passenger Corporation ('Amtrak'), is enjoined from instituting or furthering any legal proceeding for the assertion or enforcement against the Trustees or the estate of the Debtor of any alleged obligation or liability for track maintenance or improvement, in any jurisdiction or before any tribunal except this Court (or, if appropriate, in the Special Court), or as otherwise ordered by this Court. Nothing in this Order shall be deemed to apply to the appeal now pending in the Circuit Court of Appeals of the Seventh Circuit, nor to any appeal from this or any other Order of this Court."

 *Matter of Penn Central Transportation Co.*, 422 F.Supp. 67, 74–75 (E.D.Pa.1976) (hereinafter "the *Reorganization Court's Opinion* ").

2. Order of Confirmation Concerning NAP Case No. 11; *In re: Level of Rail Utility Final Decision and Award as to Penn Central* (S.D.Ind. Civil No. 1P76–76–C, March 24, 1976).

3. NAP Case No. 11; In re: Level of Rail Utility, Final Decision and Award as to Penn Central, dated February 3, 1976 (hereinafter "the Arbitration Award").

4. *National Railroad Passenger Corporation v. Blanchette*, Memorandum Order of June 25, 1976 (S.D.Ind., Civ. No. IP 76–274–C), *reversed and remanded, National Railroad Passenger Corporation v. Blanchette*, 551 F.2d 127 (7th Cir. 1977), petition for certiorari filed, 46 U.S.

## I. FACTS

Initially on this appeal, Amtrak's arguments relied on the *res judicata* effects of a June 25, 1976, declaratory judgment [4] of the Indiana district court which held that its March 24, 1976, confirming order was a conclusive bar against any further claims by the trustees that the Rail Act rendered the arbitration award unenforcible. In this connection, Amtrak also argued that the Reorganization Court had no jurisdiction to take any action in this matter except to enforce the now confirmed arbitration award. [5] After the entry of the Reorganiza-

L.W. 3013 (July 19, 1977). The June 25 Order provided in pertinent part:

"The judgment upon the arbitration award of the National Arbitration Panel entered by this Court on March 24, 1976, is *res judicata* concerning and is a conclusive bar against any further legal claims which may be made by the Trustees that:

"(a) the award of the National Arbitration Panel and judgment of this Court entered thereon is invalid or nonenforceable because of the provisions of the Regional Rail Reorganization Act of 1973; or

"(b) the rehabilitation of the rail lines which are the subject of this controversy at the sole cost of the Trustees is unreasonable or inequitable in view of the April 1, 1976, transfer of these lines to ConRail; or

"(c) the judgment should not be carried out because of any facts, circumstances or legal defenses which could have been or ought to have been asserted during the confirmation proceedings as a ground for vacating the award under the provisions of Section 10 of the Federal Arbitration Act or for modifying or correcting this award under Section 11 of the Federal Arbitration Act, 9 U.S.C. §§ 10 and 11."

*Id.* at page 7 of slip opinion.

5. See, *e. g.*, National Railroad Passenger Corporation's Motion to Sever and Strike Trustees' Rail Act Assertions, dated August 27, 1976 (reproduced in appendix at 74a–77a).

 "Although Amtrak has petitioned [the Reorganization Court] to enforce the arbitrators' award, as confirmed by the Indiana court, it is apparently the contention of Amtrak's counsel that the only issues which [the Reorganization Court had] the jurisdiction to decide relate to choices as to which of the Debtor's assets should be devoted to the contemplated track improvement. Amtrak seems to be contending that all other issues either have already been decided elsewhere, or cannot be decided because they should have been decided elsewhere."

tion Court's Order 2569 in October 1976 and the filing of briefs for the appeal in this Court but before oral argument here on April 1, 1977, a panel of the Seventh Circuit reversed the June 25th declaratory judgment of the Indiana district court. *See National Railroad Passenger Corporation v. Blanchette*, 551 F.2d 127 (7th Cir. 1977) (hereinafter cited as *Blanchette* ). In reversing the district court, the Seventh Circuit held, *inter alia* :

> "[T]hat the Declaratory Judgment of the Indiana Court was an improper exercise of its limited jurisdiction and was wrong on the merits. Accordingly, the judg-

ment of the Indiana Court is reversed. This case is remanded to the Indiana Court with directions to vacate its declaratory judgment.

> "The issues hereinabove discussed are within the exclusive jurisdiction of the Pennsylvania Reorganization Court and it may now proceed therewith."

*Id.* at 136. In our view the Seventh Circuit's decision either mooted or severely undermined most of Amtrak's contentions in its initial brief.[6] However, because certain language in Part III [7] of the Reorganization Court's opinion and order 2569 is ambiguous

---

*Reorganization Court's Opinion, supra* at 68–69.

It is evident from the transcript of the September 8, 1976, hearing before the Reorganization Court that the only issue presented by Amtrak to that Court was that the declaratory judgment of the Indiana district court precluded the trustees from raising or litigating any defense related to the passage of the Regional Rail Reorganization Act of 1973.

6. Amtrak framed the issues as follows at page 2 of their brief:

"1. When the Trustees in a bankruptcy reorganization appear with the consent of their bankruptcy court in a confirmation proceeding in a coordinate federal district court to determine the validity of an arbitration award, is the bankruptcy court empowered to limit, by its own order, the scope of the judicial review of the award so judgment entered thereon does not have the effect prescribed by § 13 of the United States Arbitration Act, 9 U.S.C. § 13?

"2. Can a court sitting in a § 77 reorganization by its own order reserve to itself powers to review collaterally the enforceability and legal validity of an arbitration award against the Trustees of the debtor when final judgment has been entered upon the award by a coordinate federal district court pursuant to the provisions of the United States Arbitration Act, 9 U.S.C. §§ 1–14?

"3. Must a court sitting in a § 77 reorganization give *res judicata* effect to a judgment of a coordinate federal district court upon an arbitration award against the Trustees of the debtor when such judgment is presented to the bankruptcy court for satisfaction and enforcement?

"4. Is a judgment entered by a United States District Court other than the reorganization court, declaring the rights and obligations established by a judgment confirming an arbitration under 9 U.S.C. § 13 and stating that the trustees of the debtor are estopped by judgment from asserting that the award is legally unenforceable under the Rail Act,

binding upon the Trustees in subsequent reorganization proceedings?

"5. Does an injunction issued by a § 77 reorganization court against 'any legal proceeding' by Amtrak to resolve disputes arising under a statutory contract with the Trustees by an arbitration process specifically agreed to by all railroads contracting with Amtrak under the Amtrak Act violate the statutory or constitutional rights of Amtrak or contravene the prohibitions of 28 U.S.C. § 959 or 11 U.S.C. § 205(j)?"

7. Part III provided:

"[8] The basic agreement between Amtrak and the Trustees required the Trustees to maintain the trackage at its May 1, 1971 level of utility for a period of 25 years. But on April 1, 1976, as mandated by the Rail Act and the final System Plan promulgated thereunder, the Trustees' ownership of the railroad and responsibilities for operating it became vested in ConRail. The suggestion that the Trustees nevertheless remain liable to maintain the property for all, or any part of, the remaining 20 years of the term of the agreement deserves serious consideration only if one assumes that Amtrak, unlike all of the thousands of other parties having legal relationships with the Penn Central, has been granted some kind of immunity from the impact of Congressional action. Needless to state, no such immunity has been conferred.

"[9] Congress plainly intended to eliminate the involvement of bankrupt estates and reorganization courts in the ownership and operation of the rail system in the northeastern part of the United States. By providing, in the Final System Plan approved by Congress, for the conveyance of ownership and operating responsibilities to ConRail as of April 1, 1976, Congress achieved that goal. The Final System Plan itself expressly deals with the question of ongoing maintenance and improvement of trackage to the level required by Amtrak (see Final System Plan

or might be read to have an effect *in futuro* far outstripping that justified by the hear-

Vol. 1, pp. 30, 43–44). To require the Trustees to plan for, finance, and carry out maintenance and improvements after the April 1 cutoff date would be clearly *inconsistent with* these provisions, as well as with the provisions of § 211(h) of the Rail Act (governing the transitional financial arrangements between ConRail and the Trustees) and the valuation process now under way in the Special Court.

"The contract between the Trustees and Amtrak makes it abundantly clear that the question of maintenance and improvement is inseparable from continued ownership. The Trustees were required to maintain their own railroad, not someone else's. They were required to use their own employees (because of the terms of existing collective bargaining agreements), not someone else's. The contract purports to be binding upon the successors and assigns of the Trustees, without regard to whether such successor or assignee did or did not assume the obligations of the contract. Whether this means that Amtrak is entitled to enforce these obligations as against ConRail is not for this Court to decide. Depending upon how that question is ultimately resolved, it may be that Amtrak might be able to establish that implementation of the Rail Act has deprived it of valuable rights, for which it is entitled to a remedy; or ConRail might be able to establish that its assumption of these liabilities comes within the 'other benefits' aspect of the valuation proceedings in the Special Court. I express no view as to any of these matters.

"For the reasons thus far discussed, the relief sought by Amtrak in the present case cannot and will not be granted."

*Reorganization Court's Opinion, supra* at 73–74 (footnotes omitted). We note that § 211(h) was amended after the Reorganization Court's opinion and order in this case. Whether or not this amendment will affect the outcome of this case will be a matter for the Reorganization Court on remand. We express no view of the point at this time.

8. The four pertinent questions were as follows:
"1. Under Part III of the district court Memorandum and Order No. 2569 of September 30, 1976 (87a ff.), are all of the Penn Central trustees' obligations under the 1971 agreement now excused because of the operation of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq. ('the Rail Act'), or are only the obligations under Section 4.2 (maintenance) of the contract excused?

"2. Does the above Memorandum and Order operate *as a bar against* (1) *any action by* Amtrak for damages for any breach of contract which may have occurred prior to April 1, 1976, or (2) any other remedy, such as restitution, which Amtrak may have?

"3. What is the significance of the citation in the above Memorandum Opinion to § 211(h) of the Railroad Revitalization Regulatory Reform Act of 1976, 45 U.S.C. § 801 ff.?

"4. Did Conrail become an indispensable party to this case upon the passage of the Regional Reorganization Rail Act in 1973?"

We note that in the briefs responding to the above questions the parties have taken diametrically opposed positions on each point. It is now evident that these require a fuller development on the record. However, we turn to ConRail's status as an indispensable party. ConRail has filed a memorandum in this case which indicates that it had specifically rejected the Basic Agreement of 1971 and had entered into a 1976 agreement with Amtrak whereby "The ConRail Rail Lines used in Amtrak's Intercity Rail Passenger Service . . . *shall be maintained by ConRail in no less than the condition in which such Rail Lines were conveyed to ConRail under the Rail Act.*" ConRail's position is that the "Bill of Sale and Assignment" conveying Penn Central's rail assets to ConRail specifically provided that ConRail was not to assume Penn Central's pre-conveyance maintenance obligations to Amtrak. For its authority, ConRail relies on Section 303(b)(2), 45 U.S.C. § 743(b)(2) of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq.*, P.L. 93–236, January 2, 1974, 87 Stat. 986 (hereinafter the "Rail Act") which provides that the rail properties were conveyed to ConRail "free and clear of all liens and encumbrances." ConRail's contentions concerning its responsibilities on the 1971 Basic Agreement between Amtrak and Penn Central have never been subjected to judicial review and, at this point, they are entitled to no more weight than the contentions of any other litigant. Other sections of the Rail Act indicate that upon conveyance of the properties ConRail was to assume the responsibility for maintaining and upgrading lines used by Amtrak. See *e. g.*, 45 U.S.C. § 716(a)(7), 742(c), (d). The fundamental purpose of the 1971 Amtrak Act that an efficient and effective rail passenger service was needed in the Northeast and Midwest as a matter of national policy was never repealed or abandoned by the Congress when it enacted the 1973 Rail Act; if anything, the Rail Act demonstrates that this purpose was reiterated and in reiteration strengthened. *Compare* 45 U.S.C. § 501 *with* 45 U.S.C. § 701. In short, the merits of ConRail's views on its obligations *to Amtrak are not as clear cut as* ConRail urges. Finally, ConRail's obligations to maintain Amtrak's passenger routes as reflected in

each be covered in oral argument. Our concerns are essentially twofold: first, the language of order 2569 seemed to preclude further resort to the Arbitration panel should any further disputes arise that, otherwise, would have been within the purview of that forum's jurisdiction. Secondly, the contextual nexus of the order and Part III seemed to preclude Amtrak from ever asserting any claim for contractual breaches occurring during the preconveyance period (*i. e.* the period from May 1, 1971 to April 1, 1976).[9] Language of a subsequent opinion of the Reorganization Court has alleviated many of these concerns as will be discussed below (see pp. 177–178 *infra*).

For the sake of clarity and to frame an essential perspective into this case, it is necessary that we outline the rather complex statutory and factual background of this case. We are indebted to Judge Hastings' analysis in the Seventh Circuit opinion.

In accordance with the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 *et seq.*, Amtrak was authorized to contract with each railroad undergoing reorganization and operating passenger trains in a basic system, for use by Amtrak of railroad tracks, facilities and services "on such terms and conditions as the parties may agree." See 45 U.S.C. § 562(a). Pursuant to this statutory authorization, Amtrak entered into The National Railroad Passenger Corporation agreement of April 16, 1971 (the "Basic Agreement"). The Basic Agreement's purpose was "to relieve the railroad of its entire responsibility for the provision of intercity rail passenger service" under "such terms and conditions as necessary to permit the Corporation [Amtrak] to undertake passenger service on a timely basis." 45 U.S.C. § 562(a). Article 6 of the Basic Agreement incorporated by reference the National Railroad Passenger Corporation Arbitration Agreement (the "Arbitration Agreement"). Essentially, the Arbitration Agreement established a system of adjusting *contract disputes* through resort to an arbitration panel, rather than through constant resort to the Reorganization Court.[10]

the Final System Plan are tenuous and without any statement of firm priorities; the ICC order of March 31, 1976, also filed in this case, goes no further; thus, Amtrak's needs may never be fulfilled and the Congressional purpose of 45 U.S.C. § 501 may be defeated if we allow this matter to remain as it now stands without a full adjudication. *But see* Part III as set forth in note 7, supra. Therefore, upon remand the Reorganization Court shall order the joinder of ConRail as an indispensable party in this action under Bankruptcy Rules 8–602(b) & 719. Joinder of ConRail may serve to eliminate those problems generating the Reorganization Court's concern that Penn Central might be compelled to complete its contractual obligations to Amtrak but be foreclosed from recovering their value in the Special Court.

**9.** Amtrak understood the opinion and order in this manner and raised the point in its initial briefs. In their answering brief the Penn Central trustees asserted that any remedy for damages that Amtrak might otherwise have against Penn Central now had to be asserted against the United States as a Tucker Act claim. In Penn Central's brief responding to our question, see note 8, *supra*, the trustees conceded that Amtrak's damage claims could be pressed in the Reorganization Court, subject, however, to any defenses or offsets Penn Central might have; the Reorganization Court's latest opinion in regard to this matter takes a similar point of view.

Amtrak has conceded on this appeal that the conveyance of the Penn Central rail assets to ConRail on April 1, 1976, excused the trustees from the balance of their maintenance obligations on the contract; thus, we need not consider that point here. We note, however, that although Penn Central took the position on its brief that the conveyance was an eminent domain taking excusing its obligations to Amtrak, in its brief replying to our letter and at oral argument, its counsel nevertheless asserted that the conveyance did not vitiate the entire contract thereby suggesting that Amtrak continued to have unexecuted obligations under the agreement to Penn Central. In other words, Penn Central's position in regard to the effect of the conveyance on different portions of the contract seems to be somewhat inconsistent. In any event, the record in this case in regard to these contentions is not sufficiently developed for us to take a point of view on the matter at this time and it is unnecessary that we do so. However, if Penn Central feels that portions of the contract continue to create binding obligations between it and Amtrak, the precise boundaries of that contention are to be developed by the Reorganization Court on remand.

**10.** Language within the *Arbitration Award, supra,* is instructive on this point; it states:

"Article Six of the Basic Agreement limits the authority of the Panel to 'the interpreta-

"Under the terms of the Basic Agreement, Amtrak undertook to assume the intercity rail passenger responsibilities of the Trustees of Penn Central and all other contracting railroads, and Penn Central undertook to render certain services to Amtrak and to maintain its rail lines used by Amtrak at an agreed upon 'level of utility.'

"Under Article Six of the Basic Agreement any 'claim or controversy' between Amtrak and Penn Central was to be resolved by binding arbitration in accordance with the provisions of The National Railroad Passenger Corporation Arbitration Agreement separately contracted to by the parties on April 16, 1971. Referred to by the parties as the 'Arbitration Agreement,' Section 4.2 provides:

'* * * [A]ny arbitration award hereunder made by a *majority* of the members of any Arbitration Panel shall be binding upon the parties thereto. Any arbitration award hereunder shall declare the rights of the parties thereto and *may make awards of money, or enjoin or otherwise operate in such a way as to require specific performance by a party of any act or obligation.'* (Emphasis added.)

Section 4.3 of the Arbitration Agreement further provides:

tion, application, or implementation of this Agreement,' and Section 4.5 of the Arbitration Agreement requires that the Panel 'be governed by the provisions and language of the applicable Basic Agreement or Agreements.' Accordingly, the Panel does not consider that it is the proper body to decide whether, or to what extent, the Regional Rail Reorganization Act of 1973 or the Final System Plan thereunder may affect the carrying out of this award."

*Arbitration Award, supra* at 11 (reproduced at 35a, appendix). It is this language—explicitly *limiting the scope of the matters adjudicated* before the arbitration panel—that is at the very heart of this suit.

11. The Reorganization Court's reasons for the entry of this order and its view of the order's effects is outlined in the Court's opinion. See *Reorganization Court's Opinion, supra* at 70–72. It is clear that Amtrak representatives were fully aware of the order *prior* to the time of execution of the Basic Agreement. In view

'Judgment may be entered upon any arbitration award hereunder * * * in any United States District Court.'"

*Blanchette, supra* at 130.

"In authorizing the Trustees of Penn Central to enter into the Basic Agreement with Amtrak, the Reorganization Court in Order No. 238, in pertinent parts, stated:

'1. The Trustees are authorized to execute a contract with Amtrak in substantially the form submitted to the Court at the hearing, PROVIDED, however, * * * (b) that whenever any matter is resolved by arbitration pursuant to the Main Agreement or the Arbitration Agreement, the decision shall be submitted to this court for review and approval before becoming finally binding upon the Trustees or the Debtor, during the pendency of these reorganization proceedings.

\* \* \* \* \* \*

'4. The Court reserves jurisdiction over said contract for the purpose of directing such actions and granting such further relief as may be necessary to protect the interests of the Debtor's Estate.'"[11]

*Id.* at 131–32.

"A dispute arose between Amtrak and Penn Central concerning the 'level of

of *Blanchette, supra*, it is unnecessary that we extensively analyze Amtrak's contention on this appeal that Order 238 was improper; it would appear that the Reorganization Court's analysis is substantially correct.

"Language from Amtrak's memorandum, as it appears in the record in the Reorganization Court, reads:

'any judgment entered by the Indianapolis District Court upon Amtrak's Petition to Confirm will not serve to make the award of the National Arbitration Panel finally binding upon the Trustees. To become finally binding, execution on the judgment would be necessary. Yet execution in any court other than this Reorganization Court would so manifestly interfere with the Court's exclusive jurisdiction to control the administration of the estate that it would be impossible to support in law or fact. Therefore, in order for Amtrak to make the award *finally binding* upon the Trustees, the entire matter will eventually have to be submitted in the bank-

utility' of about 360 miles of certain rail lines of Penn Central connecting Kankakee, Illinois, with Louisville, Kentucky, and Cincinnati, Ohio, via Indianapolis, Indiana, under the Basic Agreement of 1971. Amtrak's claim that Penn Central had defaulted in its obligation to maintain the track was duly submitted to the National Arbitration Panel.

"After the parties submitted extensive written memoranda and oral testimony was heard, the arbitration was interrupted by an 'Emergency Order' of the Federal Railroad Administration on August 1, 1974. This emergency order terminated Amtrak's service on the above-mentioned Penn Central line because the track had been found to be 'in an unsafe condition,' creating 'an emergency situation involving a hazard of death or injury to persons affected by the use thereof.'

"Without objection from Penn Central and in accordance with its rules, the Panel began additional hearings, accepted a revised request for an award from Amtrak, and received additional evidence on September 11, September 24, September 29 and December 16, 1975, and January 20, 1976. Thereafter, on February 3, 1976, the National Arbitration Panel issued a written award in NAP Case No. 11, *In Re: Level of Utility*, with the following declarations and awards:

"First, the Panel declared that Amtrak had a contract right to have the Penn Central Rail lines connecting Kankakee

with Cincinnati and with Louisville via Indianapolis kept 'at no less than the level of utility' which existed on May 1, 1971.

"*Second, the Trustees of Penn Central had defaulted in keeping this bargain.*[12]

"Third, the Trustees were ordered to 'cause' the restoration of these lines to their proper condition by January 1, 1978, in accordance with a 'Panel Program,' which provided, *inter alia*, for a detailed work schedule to be submitted to Amtrak within ninety days of this award.

"The estimates of the cost of these repairs ranged from 22 million dollars, based upon independent evaluation, to 11 million dollars, estimated by Penn Central using its own employees. Costs were estimated in terms of October 1975. The Panel's award further provided that Penn Central would bear the entire financial burden of the repairs."

*Id.* at 130–31 (emphasis supplied) (footnote omitted).

"[T]he Arbitration Panel held that it was without jurisdiction to decide the [issue of whether the passage of the Rail Act and the pending conveyance of Penn Central properties to ConRail would operate to excuse the performance of Penn Central's contractual obligations to Amtrak]. The issue was not raised before the Indiana Court. Yet, Amtrak urged and the Indiana Court held [in its declaratory

---

ruptcy proceedings * * * The mere fact that the arbitration claim has been reduced to a judgment will not prevent this Court from making an inquiry since the merger of a claim into a judgment does not change its nature as far as provability is concerned.' " *Blanchette, supra* at 132.

12. In other words, the breach considered by the Arbitration Panel occurred during the preconveyance period, May 1, 1971, to April 1, 1976. Furthermore, the fact that arbitration was initiated on January 11, 1973, suggests that a significant percentage of the deterioration occurred prior to passage of the Rail Act on January 2, 1974.

Reduced to its essentials, the trustees' argument is simply that the Rail Act excused their performance not only for preconveyance breaches of the Basic Agreement occurring af-

ter passage of the Act but also for those occurring prior to January 2, 1974. There may be grounds, as the trustees assert, that will excuse their performance after passage of the Act, but it is more difficult to see how their asserted Rail Act defense applies to the pre-passage breach. On the other hand, the record before the court is not sufficiently developed for us to determine the Arbitration Panel's position on this point or even to ascertain if evidence was introduced at the arbitration proceeding that would delineate the scope of the pre-passage breach. Also, the trustees' position on this point is not clear. See also discussion in note 15, *infra*. Accordingly, we express no view of the outcome of the problems pointed out in this note other than to indicate that it should be considered on remand. See notes 9 above and 15 below.

judgment of June 25, 1976] that the Trustees could not raise the issue of the transfer of the subject lines to ConRail."

*Id.* at 136.

"On February 4, 1976, pursuant to 9 U.S.C. § 9, United States Arbitration Act, and Section 4.3 of the Arbitration Agreement, *supra,* Amtrak petitioned the United States District Court for the Southern District of Indiana, Indianapolis Division, for confirmation of the arbitration award. However, on February 17, 1976, Penn Central petitioned the Reorganization Court in the Eastern District of Pennsylvania for an order requiring Amtrak to show cause 'why it should not be required * * * to comply with the provisions of Order No. 238 and, pending the filing of said petition, why it should not be enjoined from proceeding further in the [Confirmation Proceedings].'"

*Id.* at 131.

"The Reorganization Court, however, never ruled on Penn Central's February 17, 1976, petition to show cause, because the Trustees of Penn Central subsequently consented to the entry of a judgment in the Indiana Court. *The consent of the Trustees, and by implication that of the Reorganization Court, was induced by the assurances of counsel for Amtrak that it was only attempting to liquidate its claim in the Indiana court, and that Amtrak was well aware of and, in fact, accepted the primary jurisdiction of the Reorganization Court.*"

*Id.* at 132 (emphasis supplied).

"Thereafter, the Trustees consented to the entry of judgment in the Confirmation Proceedings in Indiana, based upon the above assertions in the Reorganization Court, that the Indiana Court would review the arbitration proceedings 'to see that the award was a proper award and that the arbitrators acted honestly and did not exceed their powers.' Thereafter, the Indiana Court entered an Order of Confirmation on March 24, 1976.

"On April 9, 1976, Amtrak petitioned the Reorganization Court for enforcement of the now confirmed Arbitration Award. Penn Central, thereafter, filed an answer to the petition for enforcement, asserting that the award could not be enforced against Penn Central because the rail tracks in question had been conveyed to ConRail pursuant to the Rail Act, and therefore, Penn Central's obligation to restore the tracks was terminated. Amtrak secured an indefinite postponement of its petition in the Reorganization Court, returned to the Indiana Court and filed its . . . declaratory judgment action in Indiana." [13]

*Id.*

Following oral argument in this court, on April 22, 1977, the Reorganization Court entered Memorandum and Order Nos. 2921 and 2922. Generally, the Memorandum discussed and the Orders dealt with certain aspects of the Penn Central Trustees' Proposed Plan of Reorganization not at issue in this appeal; however, as Amtrak objected to certain of the trustees' proposals, the Reorganization Court had occasion to enter into the following discussion which has particular relevance to this case:

"*Amtrak's Objections*

. . . . .

"Amtrak is not a direct provider of passenger service, but rather contracts with operating rail carriers for them to provide Amtrak's passenger service. The Debtor performed such services for Amtrak from May of 1971 until the conveyance of the Debtor's rail property to ConRail on April 1, 1976. Amtrak has been pursuing a rather complex litigation strategy to assert certain claims allegedly arising from the Trustees' failure to meet their pre-conveyance contractual obligations. As part of this effort, Amtrak presented to this Court a petition for enforcement of an award made by an arbitration panel, which determined that, during the period before conveyance of the rail system to ConRail, the Trustees had failed to maintain certain passenger track at the level of utility required by

---

**13.** See note 11, *supra.*

the contract between the Trustees and Amtrak. The relief sought was in the nature of specific performance: an order requiring the Trustees to perform certain engineering services and to plan for, and thereafter carry out, certain large-scale track restoration. I denied Amtrak's request because the conveyance of the railroad to ConRail pursuant to the RRRA render performance of track maintenance by the Trustees a legal and practical impossibility. *See In re Penn Central Trans. Co. (Petition of Amtrak to Enforce Arbitration Award)*, 422 F.Supp. 67 (E.D. Pa.1976).

"Although I had no occasion at that time to decide whether Amtrak had a claim for damages, I did point to some possible obstacles to the successful assertion of any such claim: Before the arbitrators, Amtrak expressly disavowed any claim for damages; the causal relationship between the level of track maintenance and Amtrak's revenues might be difficult to establish; and the amount of money due the estate from Amtrak under the agreement would have been greater if the Trustees had spent the amount of money for track maintenance which Amtrak contended was necessary. *By reiterating these potential infirmities, I do not mean to preclude Amtrak from asserting any claim it may feel is justified.* The Third Circuit presently has under advisement Amtrak's appeal in that matter.

"It would be difficult to conclude that Amtrak has standing to object to the tax compromise if the only basis for such objection is its alleged right to have the Trustees do heavy track work on ConRail's railroad. *However, Amtrak now seems to be asserting that it has administration claims against the estate of approximately $150 to $170 million in contract damages* (Docs. Nos. 12096, 12694).[15] *While the validity and amount of these claims has not yet been established,* the

reasonable course at this point is to accord Amtrak standing as an administrative claimant. *Cf.* Rule 8–306(a).

"[15] *The claim apparently includes the specific segment of rail line involved in Amtrak's prior petition, as well as additional instances of alleged failure on the part of the Trustees to maintain the quality of the track and roadbed.*

. . . *Amtrak's claims are not even liquidated.* . . . *If and when Amtrak establishes that it has an administration claim, adequate provision can be made to satisfy its claim.*

*Id.* at pages 20–22 of slip opinion (emphasis supplied).

## II. THE SCOPE OF THE REORGANIZATION COURT'S ORDER 2569

The issue yet to be decided is whether the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq.,* as amended, and the consequent conveyance of certain of Penn Central's rail assets to ConRail excused the Penn Central trustees from performance of work or damages claims related to Penn Central's pre-conveyance contractual track maintenance obligations to Amtrak as required under the Basic Agreement. At this point in the litigation, the Reorganization Court has not definitively granted or denied any claim made by Amtrak related to the alleged pre-conveyance contractual breaches of the Penn Central because the Arbitration Panel never decided whether the conveyance to ConRail relieved the trustees of liability for money damages and did not consider the effects of the Rail Act on the performance of the obligations. In short, the Rail Act issue has never been litigated in any forum.

◼ In developing the record below, Amtrak relied almost exclusively on the *res judicata* effect of the Indiana district court's declaratory judgment without ever reaching the substantive merits of the Rail Act's effects; this position has been vitiated by the reversal in *Blanchette, supra.*[14] Un-

14. The Seventh Circuit's decision in *Blanchette, supra,* now represents the law of the case as far as the June 25 declaratory judgment is concerned. See 1B Moore's Federal Practice ¶ 0.404 *et seq.* (2d ed.). Therefore, even if we

disagreed with the Seventh Circuit, it would be anomalous if we were to reach a result on this appeal which would have the practical effect of reinstating the declaratory judgment of the Indiana district court. See *Insurance Group*

der the Indiana district court's confirmation order of March 24, 1976, however, Amtrak has established, at least, a case of pre-conveyance contractual breaches by the Penn Central trustees. We have noted that the record is substantially undeveloped with regard to the Rail Act issue and to the effect of the Final System plan in relieving the Penn Central trustees of liability, as an expense of administration, for damages for the breach of contract found by the Arbitration Panel and "confirmed" by the Indiana district court. We express no opinion on these issues at this time. See, e. g., note 12 above. It is also clear that the determination of the amount of damages is still to be decided. See *Arbitration Award* at 32a–33a.

 The language of Order 2569 would be too sweeping if we did not have the Reorganization Court's Memorandum and Order Nos. 2921–2 of April 22, 1977. However, in light of the wording used there, it is clear that Amtrak has the right to request enforcement of the arbitration award by the Reorganization Court or to establish its claims to damages as a result of the pre-conveyance breaches.[15] Although we believe the language of the Reorganization

Court's order in this case contemplated no more than that enforcement of the *Arbitration Award, supra,* is now to be reviewed by the Reorganization Court in the light of any defenses which the trustees may raise, we have concluded that the language of the first sentence of paragraph 2 of Order 2569 is too sweeping and will be vacated.[16]

We agree with Judge Hastings' holding that "the Indiana Court was without jurisdiction by declaratory judgment, or other judicial means, to circumscribe the jurisdiction of the Pennsylvania Reorganization Court as to the enforcement of an arbitration award which was subsequently confirmed by the Indiana Court, and we now so hold." *Blanchette, supra,* at 135.

For the reasons stated, the first sentence of paragraph 2 of Order 2569 will be vacated and that order will be affirmed in all other respects, with directions to the court, on remand, to join ConRail under Rule 719, if this has not already been done (see footnote 8 at pages 173–174 above). That Court may now proceed to the question of any enforcement of the *Arbitration Award* or the claim on which it is based, taking into consideration any defenses that may be raised by the trustees.

*Committee v. Denver & Rio Grande Western R.R.,* 329 U.S. 607, 612, 67 S.Ct. 583, 91 L.Ed. 547 (1947).

Amtrak asked the Supreme Court to extend the time to file the petition for certiorari in *Blanchette, supra,* until July 15, 1977. An order staying the issuance of the Seventh Circuit's mandate until determination of such petition has also been issued by the Supreme Court of the United States (see Nos. A888 and A889, *National Railroad Passenger Corp. v. Blanchette, et al.,* Orders of April 28, 1977). See footnote 4 above.

**15.** *Cf. In the Matter of the Valuation Proceedings Under §§ 303(c) and 306 of the Regional Rail Reorganization Act,* (Special Court, Misc. No. 76–1, April 19, 1977). Although specific performance of the trustees' maintenance responsibility would appear to have been unenforceable after April 1, 1976, financial arrangements could conceivably be made by the trustees to carry out the terms of their undertaking concerning which the *Arbitration Award* found they were in default prior to April 1, 1976. See pages 5–7 above and this clause:

"*Section 4.2. Maintenance of Rail Lines.*

"The Rail Lines of Railroad used in NRPC's Intercity Rail Passenger Service pursuant either to Article Three or Article Four hereof shall be maintained by Railroad at not less than the level of utility existing on the date of the beginning of such use."

Under these circumstances, the Reorganization Court could hardly say that no relief would ever be available from the trustees. These considerations depend first on a precise delineation of Amtrak's property interests under the Basic Agreement and a careful theoretical analysis of the Rail Act and the effects of the 1976 conveyance. We think it best to defer consideration of this group of contentions until we have a clearer statement of just what Amtrak claims and what the trustees' and ConRail's responses will be.

In any event, Amtrak would not have a right to any of the funds in the debtor's estate in advance of claims entitled to a higher priority under the applicable statutory provisions governing distribution.

**16.** This sentence would preclude future arbitration under the Arbitration Agreement, even with respect to matters not involved in the *Arbitration Award.*