### In re PENN CENTRAL TRANSPORTA-TION COMPANY, Debtor.

### In re AMTRAK CONTRACT.
### No. 70–347.

United States District Court,
E. D. Pennsylvania.
April 27, 1971.

Edwin P. Rome, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Robert W. Blanchette, Philadelphia, Pa., David Kelsa McConnell, Philadelphia, Pa., for Trustees of the Penn Central Transportation Company.

Chapman Rose, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for National Rail Passenger Corp.

Joseph Auerbach, Sullivan & Worcester, Boston, Mass., for Trustee of the New York, New Haven & Hartford R. R. Co.

Matthew J. Broderick, Dechert, Price & Rhoads, Philadelphia, Pa., for Penn Central Co.

Richardson Blair, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Girard Trust Bank and Morgan Guaranty Trust Co.

### MEMORANDUM OPINION IN SUP-PORT OF ORDER NO. 238 (AMTRAK CONTRACT)

FULLAM, District Judge.

The Trustees seek approval of a proposed contract with the National Rail Passenger Corporation ("Amtrak"), pursuant to the Rail Passenger Service Act of 1970, P.L. 91–518, 45 U.S.C. § 501 et seq. Hearings were held on April

20 and 23, 1971, at which testimony was presented and all persons interested had an opportunity to present their views.

The statute became effective October 30, 1970. In essence, it contemplates the designation of an essential network of national intercity passenger trains, to be owned and operated by a semi-public corporation, established pursuant to the Act. Because the deadline for implementation of the Act is May 1, 1971, the time pressures upon those involved have been enormous. By late March, the Secretary of Transportation had designated the "basic system" pursuant to the statute, and the Amtrak incorporators had specified the trains which they proposed to operate. At about the same time, the basic contract proposals began to take shape, and it was possible for the Debtor to undertake the detailed analyses and to pursue the final negotiations leading to the proposed contract. It was not until shortly before the hearing on April 20 that the final terms with respect to job-protection provisions, as approved by the Secretary of Labor pursuant to § 401 of the Act, became known.

These same time pressures preclude detailed review of the provisions of the contract in this opinion; a general summary will suffice:

The contract requires the Debtor to provide the train service now or hereafter designated by Amtrak for a period of up to 10 years, and to keep available the required facilities for up to 25 years.

As mandated by the statute, the contract imposes upon the Debtor an initiation fee or entry fee in an amount equal to one-half of the fully distributed passenger deficit reported to the Interstate Commerce Commission for the year 1969. This payment, which comes to $52,382,109, is payable in monthly installments over a three-year period. The parties have proceeded on the working-hypothesis that these payments may be made in the form of offsets against the payments to be made by the corporation to the Debtor for providing service under the agreement. The statute provides for alternative methods of computing this entry fee (100% of the avoidable loss on intercity rail passenger service during 1969, or 200% of the 1969 avoidable loss on the intercity rail service assumed by Amtrak). Pursuant to the statute, the Debtor has reserved the right to make these alternative computations; and the contract provides the machinery for having these computations arbitrated by the Interstate Commerce Commission if necessary. Since these alternatives are options granted to the Debtor, it is apparent that the entry fee will not exceed the $52,382,109 figure mentioned above.

The labor-protective provisions approved by the Secretary of Labor provide full protection for affected employees for a period up to six years. Because of the wide range of options available to the affected employees, and the consequent impossibility of predicting accurately just which employees will ultimately be affected, the cost of this item to the Debtor is somewhat conjectural. The Trustees estimate that this figure could reach approximately $75 million over a six-year period, but there are indications that the amount may well prove to be considerably less than that.

Of major concern, of course, are the provisions governing the payments to be made by Amtrak to the Debtor for providing rail service under the contract. From the Debtor's standpoint, the contract ideally should provide reimbursement of fully allocated costs plus a reasonable return on investment. It early became obvious, however, that, at least during the start-up phase, Amtrak would be financially unable to make payments on such basis. What has emerged from the negotiations is a contract which provides a formula for computing the charges during the first 26 months of the contract; which provides areas within that formula for further negotiation and possible arbitration during the 26-month period; and which permits renegotiation of the formula after the expiration of 26 months. During the initial period, the Debtor will be reimbursed all expenses "incurred solely for the benefit

of" the designated service, plus either an override of 5% or the actual avoidable costs.[1]

Assuming that, as provided by the statute, the Debtor will be able to discontinue all intercity passenger service as of May 1, 1971, and thereafter operate all of those trains formerly operated by the Debtor which have been designated by Amtrak; assuming that the Debtor will continue to provide car repair service pursuant to the contract; and assuming that there are no appreciable delays in achieving the benefits of the contract, the evidence demonstrates that the proposed contract would have a positive impact on cash flow totalling at least $267 million over a seven-year period, ranging from $9.5 million in the first year and $27.6 million in the second year, to approximately $57 million in the seventh year and each year thereafter.[2] It is significant to note that, at the conclusion of the hearings, all but one of the parties who participated in the proceedings agreed that they had no objection to the Trustees entering into the proposed contract (the single exception will be discussed hereafter).

Several observations should be registered at this point: "Positive impact on cash flow" does not mean that the contract would be a profitable one. On the contrary, in this respect, the contract leaves something to be desired; nevertheless, these substantial reductions in the rate of cash depletion do represent substantial immediate benefits to the Debtor's estate and to the reorganization. The alternatives to approval of the proposed contract are quite bleak. The statute provides that any railroad which has not entered into a contract with Amtrak by May 1, 1971 will be precluded from discontinuing any existing intercity passenger train until 1975; and there would be no possibility of again considering entry into Amtrak until 1973. While the validity of these provisions may be open to question, the Trustees are in no position to sustain the huge losses which would be entailed in the continued operation of these trains while the validity of the statutory provisions might be litigated.

Penn Central trains comprise 70% of all of the trains to be operated by Amtrak (40% of the train miles). Without Penn Central's participation, it would obviously be difficult, if not impossible, for Amtrak to function. It is generally recognized that there is a crying need in this country for a rational unified policy in transportation matters, on a national basis. Clearly, every effort should be made to avoid frustrating at the outset this important step toward implementation of such a policy.

It may be argued that, at least on any prolonged basis, the "solely related" concept of reimbursement may run afoul of constitutional limitations. The statute on its face does not require any such result, and I am not prepared to assume that the ultimate determination, by negotiation or ICC decision, will have that effect. In view of the combination of § 77(a) of the Bankruptcy Act, § 26 of the Bankruptcy Act, and General Order No. 33 (applicable to these proceedings under General Order No. 49), I am satisfied that the final determinations in these matters must be filed with this Court for review and approval; the order to be entered will so provide. This reservation is primarily intended to as-

---

1. The Trustees have submitted to the corporation an avoidable cost study which indicates that the Debtor should be reimbursed approximately $13.7 million per year over and above the "solely for the benefit of" computation. The 5% "override" would yield approximately $5 million annually. Pending resolution of these matters, either by agreement or by arbitration before the ICC, the corporation has agreed to pay the Debtor approximately $7.9 million annually over and above the "solely for the benefit of" amount.

2. Originally, the Trustees also sought permission to issue Trustees' certificates to finance the contract; this request has been withdrawn "for the present time." The cash-flow projections demonstrate that the contract, in and of itself, will not necessitate further borrowings.

sure the procedural rights of creditors and other interested parties under the Bankruptcy Act, and is not to be construed as authorizing the Trustees to attempt any significant enlargement of the claim referred to in footnote 1, above, for the initial 26-months period. The Court also wishes to make clear that approval of the contract and its arbitration provisions does not constitute approval of a waiver of constitutional rights after the initial period, nor a judgment that such rights would or would not be impaired thereafter.

Since the conclusion of the hearings in this matter, the Court has been informally advised of various legal actions instituted in other tribunals seeking to invalidate or postpone implementation of the contract beyond the May 1 date. Whether these actions are properly maintainable, and what their ultimate outcomes may be, cannot, of course, be known at this time. Whether these lawsuits, or other factors beyond the control of the parties, may wreak such a substantial change in circumstances as to give rise to a right of rescission on the part of either of the contracting parties need not, and obviously cannot, now be considered. In the unlikely event of such drastic change, jurisdiction of this Court over the contract will be reserved.

The only opposition to the proposed contract has been expressed by United States Trust Company of New York, Trustee under the Harlem River Division Supplemental Indenture of Mortgage (dated as of December 31, 1968). In essence, the position of this objector is that the railroad property over which its lien extends would be worth more on liquidation as real estate than as a railroad and that, since the proposed contract contemplates continuation of rail operations over this property, it would violate the constitutional rights of the bondholders. There are several weaknesses in these arguments. In the first place, it is far from clear that all of the liened assets will be required for Amtrak operations under the proposed contract. The contract allows considerable flexibil-

ity to the Trustees in providing substitute facilities, and in disposing of nonessential property. More important, the constitutional rights of these bondholders will not have been adversely affected unless and until their lien is not properly treated in a reorganization plan, or reorganization is so long delayed that continued losses deplete the liened assets. The latter situation has not yet occurred, and the undeniable cash benefits of the proposed contract would diminish the likelihood of such an eventuality. These objections are without merit.

For the foregoing reasons, an order is being entered granting the Trustees' application.