**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re PROPOSED AGREEMENT WITH AMTRAK.**

No. 70–347.

United States District Court, E. D. Pennsylvania.

Nov. 3, 1977.

---

**9.** Docket Item 11, Ex. A.

**10.** *Id.* par. 6.

**11.** *Id.* par. 7.

**12.** *Id.*, Ex. A, Rider No. 2, par. 27(d).

**13.** *Id.* par. 32.

**14.** *Id.* par. 27(b).

Carl Helmetag, Jr., Donald A. Brinkworth, David Kelso McConnell, Philadelphia, Pa., and Covington & Burling by Cary Dickieson, Washington, D.C., for the trustees, Penn Cent. Transp. Co.

Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., and Sullivan & Worcester by Morris Raker, Boston, Mass., and Charles Morse, for Richard Joyce Smith, trustee, New York, New Haven & Hartford R. Co.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard and Alan Fellheimer, Philadelphia, Pa., for Institutional Investors Penn Cent. Group and American Nat. Bank & Trust Co., Bank of New York, Bankers Trust Co., Fidelity Bank, First Pennsylvania Banking & Trust Co., Girard Trust Bank, Irving Trust Co., Manufacturers Nat. Bank of Detroit, Mellon Bank, N.A., Provident Nat. Bank, Wilmington Trust Co., United States Trust Co., and Bank of New Jersey.

Curtin & Heefner by Edward I. Dobin, Morrisville, Pa., for The Bank of New Jersey.

Ewing & Cohen by William H. Ewing, Philadelphia, Pa., for the Connecting Ry. Co., trustee of the Philadelphia, Baltimore & Washington R. Co., trustee of the Delaware R. Co., and receiver of the United New Jersey R. and Canal Co.

Wolf, Block, Schorr & Solis-Cohen by Michael L. Temin, Philadelphia, Pa., for First Pennsylvania Banking & Trust Co.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia Pa., for First Nat. City Bank of New York.

In Proceedings for the Reorganization of a Railroad

FULLAM, District Judge.

An unresolved issue which has long been pending before this Court is whether or not a proposed amended agreement between the Trustees and the National Rail Passenger Corporation ("Amtrak") should be approved. Initially, disposition of this matter was deferred so that the proposed contract, and various other possible alternatives, could be compared on the basis of actual, rather than projected, figures. Thereafter, the energies of the parties and of the Court were diverted to other more pressing matters in connection with the implementation of the Rail Act, and the development of a proposed Plan of Reorganization. The ter-

mination of the Debtor's involvement in railroad operations on April 1, 1976, marked the end of the period for which the Debtor was to receive compensation from Amtrak, under the proposed agreement or any other alternative thereto, and seemed to transfer the pending proposed agreement to the category of "loose ends" which should be cleared up eventually, but need not be resolved immediately.

Because of its relationship to the pending litigation over the proposed Plan of Reorganization, and the possible impact of other litigation between the Trustees and Amtrak, resolution of the pending issues should not be further postponed.

In 1970, the Government responded to the dual problems of customer dissatisfaction with passenger service and staggering deficits from passenger operations by enacting the Rail Passenger Service Act of 1970, 45 U.S.C. §§ 501 *et seq.* The Act created Amtrak and charged it to provide modern and efficient intercity rail passenger service. After the Secretary of the Department of Transportation designated the service routes, Amtrak was to negotiate contracts with the private rail carriers for the necessary service. Failing agreement, the Interstate Commerce Commission was empowered to order carriers to provide the designated service for such "just and reasonable" compensation as the Commission might determine.

This Court approved an initial agreement between the Trustees and Amtrak, covering the start-up period. *In re Penn Central Trans. Co.*, 329 F.Supp. 477 (E.D.Pa.1971). Under that agreement, in return for providing specified passenger service, the Trustees were to receive compensation equal to the expenses "reasonably and necessarily incurred by the [Debtor] which are solely for the benefit of the [Amtrak] service." Article 5.1. Solely related costs do not include "common expenses which are inseparably incurred for the simultaneous or general benefit of more than one service" (Appendix A). The compensation provision applied to the 10-year contract term, but after May 1, 1972, either party was free to initi-

ate negotiations for modification of the compensation formula. If a negotiated agreement could not be reached within 90 days, the Interstate Commerce Commission was to fix a just and reasonable compensation for the period beginning July 1, 1973.

From the outset, Penn Central's creditors opposed approval of the agreement, alleging that the compensation provision was constitutionally inadequate. I approved the agreement despite these objections. In doing so I stated:

"It may be argued that, at least on any prolonged basis, the 'solely related' concept of reimbursement may run afoul of constitutional limitations. The statute on its face does not require any such result, and I am not prepared to assume that the ultimate determination, by negotiation or by ICC decision, will have that effect . . . The Court also wishes to make clear that approval of the contract and its arbitration provisions does not constitute approval of a waiver of constitutional rights after the initial period, nor a judgment that such rights would or would not be impaired thereafter." *In re Penn Central Trans. Co.*, 329 F.Supp. 477, 479–80 (E.D.Pa.1971).

Pursuant to the contract the Trustees, in 1972, initiated negotiations for modification of the compensation formula. No agreement was reached, and the Commission was asked to fix the compensation. On September 19, 1973, the Commission set out the general principles applicable to a determination of just and reasonable compensation. In summary, the Commission concluded:

(a) Compensation for the Amtrak service over passenger lines where the passenger service predominates and is therefore an integral part of the Debtor's entire system should be equal to the full cost of that service. Full cost is the solely related fixed and variable costs plus a portion of the unattributable fixed and variable common cost associated with the service.

(b) Compensation in instances where the Amtrak service is ancillary to the Debtor's system should equal avertable

costs. Avertable costs include fixed and variable costs traceable to the service plus variable common costs associated with the service.

(c) An incentive and penalty system tied to a standard service level is to be implemented.

(d) A rate of return of 7½% or a portion of the investment base of the assets used for the Amtrak service is also to be paid to the Trustees.

The Commission determined that the Amtrak service in the Boston-to-Washington corridor should be considered as integral to the Debtor's system and therefore compensated on a full-cost basis, whereas the remainder of the Debtor's Amtrak service should be considered to be ancillary, and therefore compensated on an avertable cost basis.

Applying a similar distinction, the Commission determined that the rate of return should be computed only on the investment base of the corridor. The Commission accepted as correct the Trustees' evidence that 39.6% of the corridor's investment base represented an appropriate allocation for the purpose of computing a return on investment for the passenger service. This percentage, when applied to an investment base of $400 million, resulted in an annual return on investment of $12 million, at the Commission's 7½% rate of return. The investment base figure of $400 million was derived by the Commission itself, using an "historical" approach, and not from the submissions of any of the parties. Detailed implementation of the Commission's principles was left, in the first instance, to the negotiation process.

Before the process of further negotiation was completed, Congress changed the rules of the game. On November 3, 1973, the Amtrak Improvement Act of 1973 was enacted. Section 562 of the Rail Passenger Service Act was amended by the addition of the following language:

"In fixing just and reasonable compensation for the provision of services ordered by the Commission under the preceding sentence, the Commission shall, in fixing compensation in excess of incremental costs, consider quality of service as a major factor in determining the amount (if any) of such compensation." [1]

Rather than returning to the Commission, the parties proceeded to negotiate against the background of both the Commission's Order and the new statutory language. In March of 1974, an amended agreement covering the period January 1, 1974 through December 31, 1975, was reached, and it is this agreement which is now before the Court for approval. [2]

Under the amended agreement, the cost of train and engine crews, commissary operations, on-board service, fuel and electricity, and certain supplies would be passed through to Amtrak. In addition, a flat annual fee of $68 million would be paid by Amtrak to the Trustees. The contract also includes an incentive-penalty arrangement tied to the quality of service. After July 1, 1975, either party would have been permitted to initiate another round of negotiations. If no agreement were reached, the Commission was to fix the compensation levels for the period beginning January 1, 1976.

Comparison of the amended agreement with the original agreement and with the Commission's order can best be shown by applying each formula to a given set of operating results. Based on the results for the year 1974, the comparison is as follows: [3]

---

1. In its September 24, 1973 Order, the Commission had defined incremental costs to be short-run avoidable costs; and included within that concept "the amount of maintenance of way, maintenance of equipment, and transportation expenses which could be saved if a particular service were eliminated." Whether this is the definition contemplated by the Congress is not certain.

2. If approved, the amended agreement would also form the basis for compensation from July 1, 1973 to December 31, 1973.

3. The figures are taken from affidavits of the Trustees' staff (Docs. Nos. 8871, 8873).

| Original Agreement (actually paid) | Amended Agreement | ICC Order |
|---|---|---|
| (All figures in millions) | | |
| $123.0 | $134.4 (basic) | $137.9 (basic) |
| | 5.1 (net incentive) | 12.0 (return on investment) |
| $123.0 | $139.5 | $149.9 |

The ICC formula total, $149.9 million, does not reflect any adjustment for implementation of an incentive-penalty program, as required under the Commission's Opinion. (If the net incentive formula under the Commission's Order were the same as that provided in the amended agreement, the total under the Commission's Order would be $155 million.)

Since the "full cost" of providing the service, as determined by the Commission,[4] would have been $137.9 million, and since the total which would be paid under the amended agreement is $139.5 million, it is apparent that the amended agreement would include only $1.6 million as return on investment. Thus, the amended agreement would have provided $10.4 million less as a return on investment than would the Commission's suggested guidelines, even without inclusion of an incentive formula in the latter. If the incentive formula were applied to the ICC formula, it would appear that the total compensation under the amended agreement is approximately $14.5 million less than would be derived under the ICC Order.

It should also be noted that none of the parties have accepted the Commission's figure of $400 million as the investment base for the corridor. After the Commission's Order was entered, and before the proposed agreement was negotiated, the Trustees offered evidence to the Commission which, if accepted, would have established that, at a rate of return of 7½%, the investment base in the corridor was such as would yield an annual return on investment of $34.7 million. And, at the hearing in this Court, it was stipulated between the Trustees, the New Haven Trustee, and the United States, that the Indenture Trustees could have introduced evidence at the hearing which would support a finding that the allocated portion, 39.7%, of the investment base for the corridor between New York City and Washington, D.C. only, would produce, at the 7½% rate, an annual return of between $39 and $58.5 million.

On the other hand, under Amtrak's view of § 562 the maximum compensation is limited to incremental costs plus an incentive-penalty adjustment. The record does not contain an estimate of 1974 incremental costs. However, for present purposes I will assume that 1974 incremental costs are equal to the $123 million in solely related costs under the basic agreement and that the incentive-penalty provision would yield an amount equal to the $5.1 million calculated under the incentive-penalty provision of the amended contract.

Thus, the proposed amended agreement would provide $11.6 million more than Amtrak's figure, but $10.4 million less than the Commission's Order without incentive provision, $33.1 million less than the Trustees' asserted investment base would justify under the Commission's formula, and $37.4 to $56.9 million less than acceptance of the Indenture Trustees' investment base figures would have produced.[5]

In seeking approval of the amended agreement in April of 1974, the Trustees expressed the belief that

"it would best serve the interests of the estate to accept the breathing spell which the amended agreement provides by offering an acceptable solution to the Amtrak compensation problem so that they

---

4. "Full cost" is used herein to refer to the principles set out in the Commission's Order of September 19, 1973. Actually, "full cost" only applies to the corridor service.

5. I refrain from discussing the methodology employed in reaching these various "investment base" figures because I have no wish to intrude upon the valuation arguments now pending before the Special Court in the RRRA proceedings. It is fair to point out, however, that whatever may be said of the valuation theories adopted, the Indenture Trustees' figures include only the New York-to-Washington segment of the corridor, and omit the Boston-to-New York segment of the corridor, and all other parts of the railroad.

may better focus their efforts on other pressing problems more important to the ultimate course of the reorganization at the present time."

That justification no longer is pertinent. But it remains true that litigation of the "just and reasonable compensation" issue before the Commission and elsewhere might prove expensive and time-consuming. There is also uncertainty concerning the eventual outcome, in view of the unresolved implications of the 1973 amendment to § 562.

In determining what would constitute "just and reasonable compensation" under the Act as originally adopted, the issues to be faced would include such matters as determining the proper approach to cost; whether return on investment was intended to be included in the "just and reasonable" standard and, if not, whether it is constitutionally required; the proper rate of return on investment; the aggregate investment base; the percentage of investment base allocable to the Amtrak service; and the proper application of an incentive-penalty program upon a bankrupt carrier whose existing facilities may not be capable of meeting otherwise reasonable schedules (and whose continued operation, during most of the relevant period, is possible only because, and to the extent that, the Federal Government makes cash available). Next, it would have to be decided whether the 1973 amendment to § 562 changed the meaning of "just and reasonable compensation" by limiting it, in effect, to incremental costs (as contended by Amtrak). Needless to say, serious constitutional questions underlie all of these determinations.

It is reasonable to assume that the final determination of "just and reasonable compensation" would be consistent with the following fundamental legal principles: A private corporation may not be required to provide a public service at cost, but is entitled to a reasonable rate of return on the investment involved; if each service performed is compensated for on the basis of incremental costs only, the provider of the services would not recover the total actual costs involved; use of an incremental cost standard for one service implies cross-subsidization of that service by other services, an approach which ordinarily assumes that the other services are being rendered at a profit, rather than, as in this case, a loss; and, while reasonable and feasible performance standards may properly be enforced through a system of incentives and penalties, any such program must be limited to matters within the control and financial means of the carrier.

For the two-year start-up period, the Amtrak agreement provided no return on investment, and payment of only "solely related" costs, but it provided a mechanism for the determination of "just and reasonable compensation" thereafter. In authorizing the Trustees to enter into the agreement, I made it clear that I regarded the implicit waiver of constitutional violations during the two-year period an acceptable price to pay for being relieved of the ongoing losses on intercity passenger service, and noted that the ICC procedure for determining the permanent compensation arrangement provided assurance against further constitutional violations after the initial period.

If the compensation provisions of the proposed amended agreement are, as the creditors argue, and as the figures rather strongly suggest, constitutionally inadequate, the question before the Court is whether the circumstances justify this further extension of the constitutional waivers initially authorized.[6] This involves an assessment of both the certainty and amount of unconstitutional impact. As set forth above, the Trustees' estimate of the ICC formula compensation for 1974 is $137.9 million plus a $12 million return in investment. Amtrak's position has been that only incremental costs are includable, approximately $123 million.

---

**6.** Analysis in terms of waiver is essential; counsel for the Government parties have consistently taken the position that losses or other adverse consequences of the Amtrak contract are in the nature of self-inflicted wounds, and cannot form the basis of either a direct Tucker Act claim, or part of a claim for unconstitutional erosion under the RRRA.

The proposal is to compromise the cost figures at \$134.4 million. Since this would seem to be well within the range of possible litigation outcomes, acceptance of the \$134.4 million cost figure as a reasonable compromise poses no great difficulty.

 The problem arises with respect to the adequacy of the return on investment. The ICC figure is \$12 million, based on what all of the Penn Central parties contend is an insupportably modest view of the investment base. Amtrak apparently contends that no such allowance should be made. The proposed amended agreement provides nothing designated as return on investment, but does contain an incentive-penalty arrangement which, on the basis of 1974 figures, would produce \$5.1 million. I am inclined to believe that there is no constitutional obstacle to tying return on investment to reasonable performance standards (*i. e.*, if the carrier performs adequately, it receives a return on investment, but can lose it if performance is shoddy). Nevertheless, the \$5.1 million net incentive under the amended agreement is so far below even the ICC's \$12 million return that it cannot be said with confidence that the amended agreement generates a fair return on any investment base figure which the present record would support.

It is therefore fair to state that supplementation of the record by inclusion of the pertinent figures for 1975 would be a distinct aid to proper evaluation of the proposed agreement. But what might have been merely desirable when this issue was first presented has now become a virtual necessity, in view of subsequent events.

In 1974, Amtrak instituted proceedings before a panel of arbitrators seeking a determination that certain of Penn Central's trackage in the Indiana area was not being adequately maintained at the levels prescribed by the basic agreement. The matter was not pressed to hearing until late in 1975. At the hearing, Amtrak expressly disavowed any intention to claim damages, but sought merely a direction to Penn Central to perform the required maintenance and upgrading work. (Estimates of the cost of performing the work involved ranged from \$15 to \$20 million.) The arbitrators determined, as a factual matter, that the trackage in question was not then being maintained at the 1971 levels required by the basic agreement. The arbitrators entered an order directing Penn Central to embark upon the necessary engineering studies and to perform the required work, at no cost to Amtrak; at the same time, however, the arbitrators left open, as not being within their jurisdiction or competence, all questions concerning the impact of the RRRA upon the validity and enforceability of their award.

The award was confirmed, in the United States District Court for the Southern District of Indiana. Amtrak sought enforcement of the award in this Court, requested a postponement of the hearing, and then obtained from the Indiana court a declaratory judgment purporting to bar the Penn Central Trustees from raising any issues concerning the impact of the RRRA. Later, the Seventh Circuit Court of Appeals vacated the declaratory judgment.[7] And the Third Circuit Court of Appeals affirmed this Court's denial of specific performance of the arbitrators' award.[8]

Meanwhile, somewhere in the course of the appellate proceedings, Amtrak apparently shifted its position, and decided to seek damages after all.

There is now pending in this Court, in addition to the present matter, (a) the remand from the Third Circuit Court of Appeals, directing this Court to make ConRail a party to the proceedings, and thereafter to adjudicate the remaining issues between the parties;[9] and (b) Amtrak's objections to the proposed Plan of Reorganization, in which Amtrak asserts, as administration

---

7. *National Railroad Passenger Corp. v. Blanchette, et al.,* 551 F.2d 127 (7th Cir. 1977).

8. *In the Matter of Penn Central Trans. Co.,* 560 F.2d 169 (3d Cir. 1977).

9. There is, or may be, lack of agreement among the parties as to the issues which are properly committed to the jurisdiction of this Court.

claims against the estate, numerous claims for damages in very great amounts, including a claim for upwards of $175 million for allegedly inadequate track maintenance.

The Trustees have contended, throughout, that the conveyance to ConRail pursuant to the RRRA, on April 1, 1976, entirely terminated Penn Central's obligations under its arrangements with Amtrak. The correctness of this assertion, and, if it is correct, the relative rights of Amtrak and ConRail under the circumstances, are among the issues to be resolved, in this Court or elsewhere.

The proposed amended agreement contains several provisions which, on their face at least, would go far toward answering some of these questions. But their significance in this context has not been addressed by the parties, probably for the very good reason that present counsel for Amtrak apparently has not been made aware of the existence of the proposed agreement (or, indeed, of any of the compensation arrangements between Amtrak and Penn Central). Counsel so stated at a recent conference in chambers which was held to discuss implementation of the Court of Appeals' mandate.

Specifically, the proposed agreement seems to establish January 1, 1974, as the benchmark for level of service, and deals expressly with the conveyance to ConRail; moreover, it seems to make the entire arrangement subject to the physical limitations imposed by the Debtor's plant.

If the proposed agreement were to be approved, it might very well resolve most of the other pending issues. On the other hand, to approve the proposed agreement as a reasonable compromise which is justified in the interests of avoiding the expense and risk of protracted litigation, while leaving those major issues open for further litigation, does not make sense.

I have therefore concluded that, in the best interests of all concerned, all outstanding issues should be briefed and argued for simultaneous disposition; and that the parties should be at least aware of the relationship of these issues to each other.

I express no view at this time as to the correct decision of any of the issues involved. And it may be that the parties will perceive issues or contentions of which I am not yet aware. But as an aid to counsel in preparation for the forthcoming argument, I suggest the following matters for consideration.

The basic agreement expressly provides that it is to be binding upon Penn Central's successors, regardless of whether or not such successor may assume the contract. Is that provision binding upon ConRail? If so, has Amtrak released ConRail? If Amtrak has released ConRail, what is the consequence of that action? Is there anything in the Amtrak statute or in the RRRA, or in the legislative history of either enactment, or in the subsequent legislative history, which sheds light as to the intent of Congress?

The basic agreement requires Amtrak to pay to Penn Central the costs "solely related to" intercity passenger service. Presumably, the cost differential between levels of maintenance required for freight service, and levels of maintenance required for intercity passenger service, are thus compensable. If freight service is discontinued over a particular line, but passenger service is to remain, what level of maintenance is compensable under the basic agreement formula? Are these questions answered by the arbitration award?

Are there any circumstances under which Amtrak can recover from Penn Central, as attributable to a breach of contract, costs of maintenance which have not been incurred? If so, (a) how would the ICC cost formula be applied, during the period covered by the proposed amended agreement? [10] (b) What

---

**10.** Indeed, the question is even broader. Since Amtrak's contention concerning inadequate maintenance ripened after this Court received the Trustees' affidavits concerning the application of the ICC Order to the 1974 results, there is obviously some doubt about the continued accuracy of those affidavits. One affidavit (Doc. No. 8873) took particular note of the fact that as a result of the lack of cash track maintenance was sharply curtailed. It appears then

is the impact of any such calculation upon the valuation proceeding before the Special Court? Do the proceedings leading to the respective congressional appropriations for Amtrak and ConRail for track rehabilitation shed any light upon these issues?

An Order will be entered scheduling a hearing at which additional evidence may be presented, and at which argument will be heard, concerning all of the issues involved in this matter.[11]

that the affidavits only reflect actual costs incurred. Since Amtrak's contention is that more should have been spent, it is necessary to ascertain what portion of the hypothetical costs would pass through under the ICC formula, the amended agreement, and the basic contract.

11. The parties will be expected to address all issues, but will not thereby waive any jurisdictional contentions they may also wish to assert.