**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re SETTLEMENTS WITH AMTRAK, CONRAIL, NEW YORK STATE AND SIX MONTHS CREDITORS.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

Aug. 11, 1978.

See also D.C., 458 F.Supp. 1364.

James E. Howard, John J. Ehlinger, Jr., Robert Szwajkos, Philadelphia, Pa., for Penn Central Trustees.

Laurence Z. Shiekman, Philadelphia, Pa., for ConRail.

Douglas G. Sanborn, Deputy Atty. Gen., Trenton, N. J., for State of New Jersey.

Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

Walter H. Brown, Jr., New York City, for Institutional Investors Penn Central Group.

David S. Hope, Philadelphia, Pa., for American Telephone & Telegraph Co. and other Bell System Companies, General Motors Corp., Syntonic Technology, Inc., Federal Transportation Co., Frank and Vincent Viseglia, et al.

Kenneth M. Kramer, New York City, for Citibank, as agent for the Committee of Secured Bank Creditors.

Spencer Ervin, Jr., Philadelphia, Pa., for New Haven Trustee.

Vincent P. Hatton, Philadelphia, Pa., for Girard Trust Bank.

Joseph A. Schafer, for Self and Class of Minority stockholders of Penn Central Co.

Brice Clagett, Washington, D. C., Carl Helmetag, Jr., Andrew P. Corcoran, Jr., Philadelphia, Pa., for Penn Central Trustees.

Robert H. MacKinnon, New York City, for Citibank, N. A., as Agent for the Committee of Secured Bank Creditors.

F. Hastings Griffin, Jr., Philadelphia, Pa., for Amtrak.

Morris Raker, Boston, Mass., for Richard Joyce Smith, New Haven Trustee.

F. L. Ballard, Jr., Philadelphia, Pa., for Institutional Investors, Penn Central Group.

Michael Patterson, for Provident National Bank.

## OPINION RE SETTLEMENTS WITH AMTRAK, CONRAIL, NEW YORK STATE, AND THE SIX MONTHS CREDITORS

FULLAM, District Judge.

In the *Approval Opinion*, a pending settlement of Amtrak's claims and the dispute with respect to the amount and character of ConRail's claims were discussed. The Trustees and ConRail have resolved their disputes and a settlement has been presented to the Court. Settlements with the State of New York and the Six Months Creditors have also been presented to the Court for approval. All four settlements will be approved.

### SETTLEMENT WITH AMTRAK

The proposal is to settle a large number of reciprocal claims between the Trustees and Amtrak by paying to Amtrak, partly in cash over a period of time, and partly in securities of the new company, a total of approximately $40 million. The claims and counterclaims which would thus be released fall into five categories, of which two are relatively insignificant: (1) adjustments in the proper accounting for Amtrak's share of certain costs; and (2) miscellaneous claims.

The remaining three categories are more significant, at least in terms of the potential theoretical exposure: (3) Amtrak's claims for track maintenance; (4) the final compensation to be paid to the Trustees for furnishing facilities and services to Amtrak after the initial start-up period; and (5) Amtrak's claims for maintenance of highway bridges over the Northeast Corridor.

The Trustees assert claims against Amtrak in the first two categories which, if the Trustees were completely successful, would mean that Amtrak owes the Trustees $16.3 million for accounting adjustments and $2.8 million for miscellaneous claims, or a total of $19.1 million. Many of the Trustees' claims are tenuous, however, and it is fair to state that the Trustees would undoubtedly consider it a victory if they established liability on the part of Amtrak for $8.8 million in accounting adjustments, and $1 million on the miscellaneous claims, for a total of $9.8 million. If Amtrak were totally successful on its claims in these categories, the Trustees would owe Amtrak $6.8 million for accounting adjustments, and $3.7 million for miscellaneous claims, for a total of $10.5 million. Here again, however, the likelihood of such a totally favorable outcome for Amtrak seems remote. I have no doubt that it would generally be considered a victory for Amtrak and a loss for the Trustees if the slate were wiped clean with respect to claims in these two categories. The realistic range of litigation possibilities, therefore, is probably between a $9 or $10 million recovery by the Trustees, on the one hand, and no recovery by either party, on the other.

Pursuant to the Amtrak statute, the parties have attempted to agree upon the appropriate level of compensation to be paid by Amtrak to the Trustees for furnishing facilities and services, covering the period from June 1, 1973 to April 1, 1976 (the date of the conveyance to ConRail), and, upon being unable to agree, submitted the dispute to the Interstate Commerce Commission for resolution. The ICC rendered an interim opinion, establishing certain guidelines.[1] The parties then worked out a tentative compromise settlement agreement, in light of the ICC guidelines and an amendment to the statute which Congress enacted in the meantime. I rejected the proposed settlement, as providing inadequate compensation to the Trustees, and Amtrak simultaneously announced its withdrawal from the settlement agreement.[2] Further litigation before the ICC would be required to resolve this dispute. If the Trustees were fully successful, Amtrak would owe the Trustees as much as $147 million. However, such complete success is unlikely. The theories on which the Trustees would be most likely to recover would generate a return of approximately $85 million. If Amtrak were completely successful, it would owe the Trustees nothing. Here again, however, the likelihood of such a result appears remote. It seems doubtful that the Trustees could fail to establish liability on the part of Amtrak for much less than $30 million additional compensation.

Thus, combining all claims in the categories thus far analyzed, it appears that the range of probable recoveries by the Trustees extends from a high of $94 or $95 million to a low of about $30 million.

Offsetting these reasonably predictable favorable results are the claims asserted by Amtrak in the remaining two categories. Amtrak asserts that it has claims against the Trustees for as much as $30 million, representing a rough estimate of what it might cost to rebuild a large number of highway bridges crossing the Northeast Corridor. The facts are these: Pursuant to the RRRA, the Trustees conveyed the railroad, including the Northeast Corridor, to ConRail. ConRail then sold the Northeast Corridor to Amtrak, at the (very low) valuations tentatively specified by USRA in the Final System Plan. ConRail conveyed the properties to Amtrak "as is." Amtrak takes the position that various highway

---

1. *Determination of Compensation under Section 402(c) of the Rail Passenger Service Act of 1970,* as amended (ICC Rep. Finance Docket No. 27353, sub. no. 1).

2. *See In re Penn Central Trans. Co.,* 440 F.Supp. 1069 (E.D.Pa.1977).

bridges crossing the Northeast Corridor should have been better maintained by Penn Central during its ownership, and that, as the present owner of the property, Amtrak may find it necessary to rebuild or restore these bridges. Amtrak expresses considerable uncertainty as to just what interest in the bridges passed to Amtrak from ConRail, but I am not aware of any contention that Penn Central retained any ownership rights in the Corridor.

In presenting objections to the Reorganization Plan on the basis of its failure to provide for this claim, Amtrak was unable to articulate any legal theory which would support the imposition of liability upon the Penn Central estate in these circumstances, and, so far as I am aware, no such legal theory has yet been developed by anyone. The benefit to the Debtor's estate from release of this claim in connection with the settlement agreement is therefore plainly minimal, namely, avoiding the costs of defending the action, if Amtrak were to attempt to pursue it.

The final category of claims to be considered is Amtrak's claims for the costs of upgrading trackage which the Trustees were required to maintain at the "level of utility" prevailing on May 1, 1971. A reasonable estimate of the aggregate amount of claims which Amtrak has asserted, or might be able to assert, in this category, is approximately $178 million. The gist of this controversy may be summarized as follows: The contract between Amtrak and Penn Central required Penn Central to maintain its tracks, for use by the passenger service, at the same "level of utility" which prevailed on May 1, 1971. The contract had many years to run when the trackage was conveyed to ConRail pursuant to the RRRA. There is a dispute between Amtrak and ConRail as to whether or not ConRail has the same maintenance obligations which Penn Central would have had. If ConRail does have those same obligations, the damages sustained by Amtrak by reason of Penn Central's alleged failures to meet its maintenance obligations would be relatively modest. If ConRail does not have the same maintenance obligations, then Amtrak may, in the future, be re-

quired to spend money upgrading the tracks used by its passenger trains which it would not have been required to spend, if Penn Central had fulfilled its maintenance obligations. On the other hand, if Penn Central had fulfilled its maintenance obligations, the tracks would have been in better condition and presumably more valuable, and thus the price to be paid for the tracks by ConRail would have been higher. More importantly, Penn Central would have been improving its own tracks, and would have had the benefit of those improvements in connection with its operation of freight service.

Amtrak will not have suffered any damage unless and until it actually does spend money to upgrade the tracks. If Penn Central is required to reimburse ConRail for such expenditures, it is difficult to avoid the conclusion that Penn Central should be in a position to recover from ConRail, the owners of the improved tracks, at least a significant portion thereof on the theory of unjust enrichment. Thus far, ConRail and Amtrak have successfully asserted that no liability may be imposed upon ConRail, except by the Special Court, While that position is certainly correct with respect to the rights and obligations arising by virtue of the conveyance under the RRRA and the contract between Amtrak and ConRail, it seems reasonably clear that the RRRA does not exonerate ConRail from liability which might arise in the future by reason of post-conveyance events, and that litigation seeking to impose such liability might be pursued in other courts, so long as it did not impinge upon the *Valuation Case* or the Orders of the Special Court stemming from the conveyance.

During the period from February 1974 to the date of conveyance, Penn Central's expenditures for track maintenance and upgrading were largely controlled by USRA, under the § 213 and § 215 programs. There is therefore an additional uncertainty concerning the legal liability of Penn Central for alleged undermaintenance during that period. More importantly, under the complex arrangements governing the amounts of money Amtrak was required to pay Penn

Central for the use of its facilities and services, at least a significant portion of the additional sums which Amtrak now claims Penn Central should have spent for track maintenance would have been reflected in increased payments from Amtrak to Penn Central. And finally, there is room for the argument that by virtue of the RRRA and the mandated conveyance to ConRail, the doctrine of contract-frustration comes into play, and that Amtrak's claim would therefore be limited to any increased costs it actually incurred during the pre-conveyance period.

If these matters were to be litigated further, Amtrak would assert that the vast sums it has already spent in upgrading the Northeast Corridor satisfy the requirement that damages must be actually incurred before they can be recovered. But no claim for undermaintenance of the Northeast Corridor has ever been suggested (with respect to the off-Corridor passenger lines, Amtrak did pursue an arbitration proceeding in connection with certain lines in Indiana (National Arbitration Panel 11), and, on the eve of the conveyance to ConRail, filed a notice of intent to arbitrate this issue with respect to other lines); moreover, there is the problem arising from the fact that Amtrak now owns the Northeast Corridor, which it purchased at a price reflecting its "as is" condition.

Perhaps the strongest argument in favor of Amtrak's claim is the "confirmed" award of the arbitrators in the NAP 11 proceeding, which, shortly before conveyance, directed the Trustees to perform certain track upgrading and maintenance which would have cost about $22 million. The Court of Appeals for the Third Circuit upheld this Court's denial of Amtrak's petition for specific performance of that arbitration award, but left open the possibility that damages in some amount might be appropriate. *In the Matter of Penn Central Trans. Co.*, 560 F.2d 169 (3d Cir. 1977). *See, also National Railroad Passenger Corp. v. Blanchette*, 551 F.2d 127 (7th Cir. 1977), reversing *National Rail Passenger Corp. v. Blanchette* (S.D.Ind., Civil No. IP 76–274–C, June 25, 1976). The Court of Appeals directed this Court to make ConRail a party to the proceeding; the Special Court thereafter entered a "stay" purportedly precluding this Court from deciding issues relating to ConRail, *see Consolidated Rail Corp. v. National Rail Passenger Corp., et al.*, Civil Action No. 77–39 (Special Ct., Dec. 7, 1977). And the issue remained unresolved until the present settlement agreement was reached. The award of the NAP 11 panel gives Amtrak two principal points of strength: It defined "level of utility" by reference to scheduled performance rather than actual performance as of May 1, 1971, and it directed Penn Central to perform the track rehabilitation "at no cost to Amtrak." With respect to the first point, the confirmed award may well be no longer subject to challenge, since that issue was within the scope of the jurisdiction of the arbitrators. (Whether other arbitrators, in other proceedings, would be required to resolve the level-of-utility issue the same way is somewhat less clear.) The "at no cost to Amtrak" language raises several issues.

If the arbitrators meant that the work was to be done at no *initial* cost to Amtrak, there is no problem. But if, as Amtrak contends, the arbitrators intended to preclude Penn Central from taking those additional costs into account in the determination of the compensation to be paid to Penn Central by Amtrak, then it would seem the arbitrators acted without jurisdiction. All issues related to determining the amount of compensation to be paid by Amtrak are committed to the ICC by statute, and the arbitration provisions of the contract specifically exclude such issues from the arbitration process. On the other hand, the ICC might be persuaded to exclude those costs from its calculation of compensation, in any event.

With respect to the additional arbitrations which Amtrak has noticed, but not pursued as yet, Amtrak would no doubt argue for consistency with the NAP 11 award, and the Trustees would contend that this would be inappropriate, in view of the impact of the RRRA conveyance (an issue which the NAP 11 panel expressly refrained from addressing), and would also assert defenses in the nature of *laches*.

As the foregoing review demonstrates, I am not persuaded that there is any great likelihood of the eventual imposition of any substantial net liability against the Penn Central estate by reason of these track maintenance claims. On the other hand, the record has not been completely developed; moreover, decision of these issues by this Court would not represent the last word on the subject.

Another factor which bears mention is the distinct possibility that some or all of the issues involved in both the track maintenance and compensation disputes between Amtrak and Penn Central might be substantially affected by subsequent legislation. For example, there is a pending proposal to amend the Amtrak statute so as to overcome the present ICC requirement that compensation for use of tracks and facilities must include some return on investment (S. 2478). The Trustees are justifiably apprehensive that the rules of the game will again be altered retroactively. Their desire to avoid such adverse consequences, and further rounds of litigation concerning them, is indeed understandable.

■ Notwithstanding these problems, it would be difficult to approve the settlement now proposed were it not for another factor which tips the scale in favor of approval: Regardless of the merit or lack of merit in Amtrak's claims, they are so large that their pendency virtually precludes consummation of a Plan of Reorganization. That is, Amtrak is in a position to object to the Plan, and has objected to the Plan, on the ground that the Plan does not fully provide for its claims in all of their ramifications. I believe the Plan could properly be confirmed notwithstanding these objections, but Amtrak would have the right to appeal, and the amount and potential priority of its claims are such that if its appeals were successful, the existing Plan could not be carried out.

It is significant that no one having standing to do so has expressed any objection to the proposed compromise settlement. This means that the Trustees, the other parties to the proceeding, and their experienced and knowledgeable counsel, are all of the view that the advantages of prompt consummation of the Plan justify the cost represented by the settlement agreement. While I am not at all sure that I agree with that business judgment, I believe the choice is appropriately left to the parties most directly affected.

In the view I take of this matter, it is disturbing to see a federally funded agency exploiting the leverage produced by its threat to block reorganization efforts on the basis of claims which I regard as lacking in substance. On the other hand, there is some consolation in the thought that the proceeds of the settlement agreement will inure to the benefit of the public, rather than private interests.

### SETTLEMENT WITH CONRAIL

The parties have proposed a settlement of a large number of very substantial claims asserted by ConRail, and partially offsetting claims asserted against ConRail by the Trustees. These include: a claim by ConRail in the amount of $54.6 million for payments made by ConRail on account of equipment obligations, allegedly chargeable against the Trustees as related to the pre-conveyance period, and certain offsets claimed by the Trustees; ConRail's contentions that the settlement agreement between the Trustees and the Government does not adequately protect ConRail's interest in connection with the § 211(h) program; disputes concerning the status of certain non-current debt interests of subsidiaries, assigned to ConRail pursuant to the RRRA and the Orders of the Special Court; and ConRail's claim to escrow accounts, in the aftermath of the Court of Appeals' decision in *In the Matter of Penn Central Trans. Co.*, 570 F.2d 118 (3d Cir. 1978).

In essence, the parties propose to settle all of these disputes by the payment to ConRail of $6.5 million in cash on consummation date, and distribution of Series C-2 Notes in the principal amount of $35 million.

No one has objected to the substance of the proposed settlement, it appears to be well within the range of reasonably foresee-

able litigation outcomes, and, since it would eliminate a potential obstacle to the prompt consummation of the Plan of Reorganization, it is in the best interests of the estate.

I have carefully considered the objections filed on behalf of the State of New Jersey, to some extent joined in by other parties, and have concluded that they are lacking in merit. The unfortunate problems relating to the payment of 1976 taxes are not germane to the settlement, and are not within the province of this Court. The somewhat more refined definition of what constitutes a § 211(h) claim is in conformity with the RRRA, and does not amount to a modification of the Plan of Reorganization. The $6.5 million cash payment can properly be regarded as a lump sum payment for ConRail's continued agency services. And the further concession made by providing that ConRail as well as USRA is entitled to insist upon retirement of the Series B Notes on schedule (with penalties for non-compliance) is entirely consistent with the Plan, does not amount to a modification thereof, and appears entirely reasonable, in view of the unique relationship between ConRail, USRA and the Debtor's estate (reorganized company) under the § 211(h) program.

■ While the overall impact of the proposed settlement is substantial, it does not impair the feasibility of the Plan. The proposed settlement will be approved.

### SETTLEMENT WITH THE STATE OF NEW YORK

Before bankruptcy, the State of New York performed certain work in eliminating grade crossings, generating claims against Penn Central aggregating some $25.3 million, payable over a period of years. $7.7 million of this amount fell due between June 21, 1970, and December 31, 1977, and remains unpaid. The State claims that the entire balance is now payable, that it represents an administration claim against the estate, and that it must be paid in cash in full.

The State of New York also has asserted claims aggregating some $20.3 million in unpaid sales and use taxes, allegedly owing with respect to leased equipment and per diem charges for the use of equipment. These claims present novel legal issues, and extremely complex factual disputes.

■ The proposal is to resolve all of these disputes by liquidating all of these claims for a total of $19 million, to be classified and satisfied under the Plan as a tax relating to conveyed property. This result is well within the range of reasonably foreseeable litigation possibilities, does not impair the feasibility of the Plan, and represents an entirely satisfactory resolution of complex and difficult issues. The settlement will be approved.

### SETTLEMENT WITH SIX MONTHS CREDITORS

The Plan provides that if any creditor is found to have a claim entitled to priority treatment under the "six month" rule, such claim would be included in Class H, and satisfied by the issuance of Series C–2 Notes. However, the Trustees contended, and this Court decided, that no claims were entitled to the six months priority. Rather, all such claims are included within Class M, general unsecured pre-bankruptcy claims.

The claims for which six month priority status is asserted aggregate approximately $60 million. Substantially all of these claimants have filed appeals from the Order approving the Plan. If it were ultimately held that this Court erred in denying six months priority status to such claims, the impact upon the reorganization would be very great indeed. Moreover, if such priority were established as a result of the appellate process, there can be no complete assurance that payment in C–2 Notes would be satisfactory.

Under the terms of the proposed settlement, all of these issues would be resolved, and the appeals would be withdrawn. Fifty percent of the amount of each claim which would qualify for six months priority if there were a fund available for payment of such claims within the meaning of the six months rule will be classified within Class H, and paid in C–2 Notes; the balance of such claims will continue to be classified within Class M, and treated accordingly.

In short, the parties have agreed that the provisions of Class H are adequate for claims entitled to six months priority, and have settled the dispute over applicability of the six months rule itself on a 50–50 basis.

I remain persuaded that none of these claims is entitled to six months priority in this case, for the reasons set forth at length in the Plan Approval Opinion. I must recognize, nevertheless, that this issue has not been squarely decided in the Third Circuit. While I found the decisions from other circuits, particularly the Second Circuit, persuasive, and believe they would be followed in this Circuit, there is room for the possibility that a different view which probably prevails in the Fourth Circuit might be adopted here.

The Trustees and the other parties have presumably carefully weighed the risks involved, and the desirability of eliminating another potential obstacle to prompt consummation of the Reorganization Plan, and have reached a business judgment. I see no reason to disturb that business judgment. The settlement will be approved.

### ORDER NO. 3722

AND NOW, this 5th day of Sept., 1978, upon consideration of the "Petition of Trustees for Approval of Settlement with Six-Month Creditors" (Petition), Order No. 3693 and the record in these proceedings, is hereby ordered that Order No. 3693 is amended to read:

1. The settlement of the claims of six-month creditors, on the terms set forth in paragraph 5 of the Petition, is approved.

2. The resolution of the issue raised by the Committee of Interline Railroads, relating to the satisfaction of the Plan of Reorganization, on the terms described in paragraph 6 of the Petition, is approved.

3. The Trustees or any one of them or their designees are authorized to take such action as may be necessary and appropriate to implement the settlement.